UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Maria-Elena Mariel Olcoz,<br>*Plaintiff,* | ) |
| | ) |
| v. | ) Case No.: |
| Judge Kathleen Sandman, In Her Individual Capacity; | ) **3:2025cv30206** |
| Officer Timothy "Tim" Budrewicz, In His Individual Capacity; | ) COMPLAINT |
| Officer Gregory "Greg" Bardwell, In His Individual Capacity; | ) AND |
| Attorney David Sharp, In His Individual Capacity; | ) DEMAND |
| DCF Workers Brenda Liimatenan, Allyn Stacy, And Rhonda | ) FOR |
| Wornham, In Their Individual Capacities, Defendants. | ) JURY TRIAL |

## PRELIMINARY STATEMENT

This is a civil rights and tort action under 42 U.S.C. §§ 1983 and 1985(3), the First, Fourth, and Fourteenth Amendments of the United States Constitution, and Massachusetts state law. Plaintiff MARIA-ELENA MARIEL OLCOZ seeks redress for egregious and coordinated acts of retaliation, due process violations, unlawful searches, abuse of process, emotional distress, and conspiracy perpetrated by individual public officials and a private attorney who conspired with state actors. These acts deprived Plaintiff of her liberty, property, safety, and parental rights, and caused her significant harm including homelessness, brain injury, trauma, and financial devastation.

1

## PARTIES

- Plaintiff MARIA-ELENA MARIEL OLCOZ is a resident of Massachusetts and the mother of a minor child who was deprived of her rights, stability, and safety through acts of coordinated state abuse.

- Defendant JUDGE KATHLEEN SANDMAN is a judge in the Massachusetts Probate and Family Court, sued in her individual capacity for non-judicial and retaliatory conduct outside the scope of her lawful duties.

- Defendant OFFICER TIMOTHY ("TIM") BUDREWICZ is a municipal police officer employed by the Shelburne Police Department, sued in his individual capacity for violating Plaintiff's constitutional rights.

- Defendant OFFICER GREGORY ("GREG") BARDWELL is a municipal police officer employed by the Shelburne Police Department, sued in his individual capacity for violating Plaintiff's constitutional rights.

- Defendant DAVID SHARP is a Massachusetts-licensed attorney, sued in his individual capacity for conspiring with state actors and engaging in unlawful advocacy beyond protected litigation conduct.

- Defendant BRENDA LIIMATENAN is a social worker with the Massachusetts Department of Children and Families (DCF), sued in her individual capacity.

- Defendant ALLYN STACY is a social worker with DCF, sued in his individual capacity.

- Defendant RHONDA WORNHAM is a DCF supervisor, sued in her individual capacity.

2

## JURISDICTION AND VENUE

Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the District of Massachusetts.

### Jurisdictional Clarification Regarding State Court Abstention Doctrines

Plaintiff expressly states that this action does not seek to overturn, appeal, or otherwise collaterally attack any judgment issued by a Massachusetts state court. The relief sought is based solely on independent constitutional violations committed by state and quasi-state actors, including but not limited to, unlawful administrative actions, coercive conduct, and retaliatory interference with Plaintiff's federally protected rights. The acts complained of were administrative, coercive, or extrajudicial in nature and are not subject to judicial immunity, and are therefore not barred by the Rooker-Feldman doctrine or Younger abstention.

- Exhaustion of Remedies Not Required / No Adequate State Remedy:  Federal claims brought under 42 U.S.C. § 1983 do not require exhaustion of state judicial remedies. Moreover, Plaintiff had no adequate or effective remedy in state court to address the independent constitutional violations raised herein, particularly those arising from administrative misconduct, coercive conduct, and ADA violations

- Statute of Limitations Compliance: All claims asserted herein are timely filed within the applicable statute of limitations, as the conduct complained of includes recent and ongoing constitutional violations, including events occurring within the last two years.

3

- No Claim Preclusion from State Court: Plaintiff's federal claims were never fully litigated in state court and are not barred by res judicata or collateral estoppel. The facts supporting these claims arose independently of any final judgment and concern actions outside the state court's adjudicative scope.

## CAUSES OF ACTION

Count I – Civil Rights Violations (42 U.S.C. § 1983)

Count II – Civil Conspiracy (42 U.S.C. § 1985(3))

Count III – Denial of Due Process (U.S. Const. Amend. XIV)

Count IV – Retaliation for Protected Conduct (U.S. Const. Amend. I)

Count V – Violation of Equal Protection (U.S. Const. Amend. XIV)

Count VI – Intentional Infliction of Emotional Distress (State Law)

Count VII – Abuse of Process (State Law)

Count VIII – Negligence and Supervisory Liability (State Law)

Count IX - Financial Coercion, Escrow Theft, and ADA Violation

## FACTUAL ALLEGATIONS AND CLAIMS

*Incorporated here are the detailed expanded factual sections previously developed for each Defendant. These include judicial misconduct, Fourth and Fourteenth Amendment violations, due process denials, abuse of DCF protocols, collusion between officials, unlawful searches, evidence suppression, retaliation, and conspiracy to damage Plaintiff's legal and familial rights.*

4

**Defendant Judge Kathleen Sandman**

1. Defendant Judge Kathleen Sandman, acting under color of state law and in her individual capacity, repeatedly and egregiously violated Plaintiff's constitutional rights and her obligations under the Massachusetts Code of Judicial Conduct, SJC Rule 3:09. Her conduct constituted a pattern of retaliation, procedural sabotage, and unlawful judicial overreach. Specifically, Judge Sandman abused her judicial authority by:

   a. Blocking material witnesses and excluding exculpatory evidence during critical protective order proceedings, denying Plaintiff her due process rights guaranteed by the Fourteenth Amendment and Article X of the Massachusetts Declaration of Rights.

   b. Extended vacate order against Plaintiff for an additional 90 days absent factual findings or legal justification, in violation of M.G.L. c. 209A, § 3 and the judiciary's own Benchbook on Abuse Prevention Proceedings, which limits such orders to credible evidence of present danger.

   c. Failing to terminate coercive alcohol testing after formally finding that Plaintiff was not an alcoholic, instead deferring repeatedly to the extrajudicial assertions of Attorney David Sharp, thereby abdicating judicial neutrality and violating Canon 2A and Canon 3(B)(2) of the Massachusetts Code of Judicial Conduct.

   d. Permitting Sharp to act as a de facto judge by crafting and enforcing unlawful conditions without evidentiary support or adversarial hearing, contravening Plaintiff's right to a fair tribunal under Goldberg v. Kelly, 397 U.S. 254 (1970).

   e. Engaging in retaliatory decision-making after Plaintiff sought protection from abuse, giving rise to a prima facie claim of unlawful judicial retaliation

5

(particularly on Oct 17th 2024) barred by *Pierson v. Ray*, 386 U.S. 547 (1967) when judges act "in absence of all jurisdiction" or for nonjudicial purposes.

2. The Massachusetts Code of Judicial Conduct, codified as Supreme Judicial Court Rule 3:09, imposes strict ethical obligations on all judges to safeguard the public's trust in the judiciary. This includes Canon 1, which mandates that a judge shall uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid both impropriety and the appearance of impropriety in all activities. Canon 1 is not merely aspirational; it is binding and foundational to the legitimacy of judicial authority.

3. Canon 2 further requires judges to perform all judicial duties impartially, competently, and diligently, obligating judges to ensure fairness not only in outcomes but in process, demeanor, and evidentiary fairness. Subsections 2.2 and 2.3 demand that a judge respect and observe the rights of all parties to be heard, and prohibit a judge from being swayed by partisan interests, public clamor, or fear of criticism.

4. Judge Sandman's conduct, including allowing a private attorney to dictate punitive testing regimes, excluding Plaintiff's evidence and witnesses, and issuing factually unsupported rulings in retaliation for Plaintiff's protected court filings, violated the letter and spirit of Canons 1 and 2. These acts eroded the judiciary's perceived impartiality and actively facilitated one party's unlawful domination over the other, violating both ethical norms and constitutional guarantees of procedural due process.

5. Judge Sandman egregiously failed to uphold the ethical mandates of Canons 1 and 2 of the Massachusetts Code of Judicial Conduct when she retaliated against Plaintiff for lawfully seeking a protective order under M.G.L. c. 209A. Rather than neutrally adjudicating the request, Judge Sandman obstructed Plaintiff's fundamental right to be

heard by refusing to allow key witnesses to testify and by excluding relevant documentary evidence—a blatant violation of Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article X of the Massachusetts Declaration of Rights, which protects every individual's right to obtain justice freely and without denial or delay.

6. This retaliation occurred not in response to any misconduct by Plaintiff, but purely in reaction to Plaintiff's assertion of her legal right to seek protection from abuse—a form of access to court that is constitutionally protected under the First and Fourteenth Amendments. Such obstruction constitutes impermissible viewpoint discrimination, and an unlawful chilling of Plaintiff's right to petition the government for redress of grievances, as recognized in *Lozman v. City of Riviera Beach, 138 S. Ct. 1945 (2018).*

7. By creating a hostile judicial environment where Plaintiff was punished for exercising legal rights and deprived of procedural tools necessary for her defense, Judge Sandman not only breached judicial ethics but acted in excess of her lawful authority, removing the shield of judicial immunity under *Forrester v. White, 484 U.S. 219 (1988).* Her conduct was not a mere legal error; it was a deliberate judicial act of reprisal that had direct and irreparable consequences, including the repeated enforcement of a vacate order that destabilized Plaintiff's housing and parental rights without a fair evidentiary hearing.

8. After systematically denying Plaintiff access to fundamental procedural protections, including the right to present witnesses, introduce exculpatory evidence, and receive fair judicial consideration, Judge Sandman unilaterally extended a vacate order against Plaintiff by an additional 90 days, compounding the constitutional and statutory

7

violations already underway. This extension was entered despite clear and uncontroverted evidence that Plaintiff was the actual victim of coercive control, domestic violence, possible attempted murder, and psychological abuse—the precise category of harm the vacate statute is designed to address.  Specifically, Sandman only allowed the Police Body-cam Footage to be shown, which clearly showed Plaintiff fully sober and explaining to officers Budrewicz and Bardwell that she and her daughter were not safe and why.  Plaintiff's abuser is then seen on camera receiving legal advice from the two officers, which her abuser then used to rush to Sandman and demand a vacate order against Plaintiff and for the abuser to have full custody of the minor child (then two years old).  Despite Plaintiff showing this evidence, Judge Sandman was visibly angry, knew the detrimental mistake she made on April 22nd, 2024, and instead of correcting the mistake Sandman immediately retaliated against Plaintiff and extended the vacate 90 days, which was the longest extension she ever ordered, while Plaintiff begged for her life on the record facing homelessness into the extremes of winter weather.  Additionally, Judge Sandman in the same hearing coerced Plaintiff to drop the several contempts of court or Plaintiff's 209A would not be heard.  This outrageous demand by Sandman proves bias, further suppression of evidence, in conspiracy with Attorney Sharp to protect an abuser, and clear manipulation and abuse of power.

9.  Massachusetts law, specifically M.G.L. c. 209A, §§ 3 and 4, requires that any extension of a vacate order be supported by specific factual findings of continued risk of harm, following a meaningful adversarial hearing and review of relevant evidence. Judge Sandman made no such findings, nor did she articulate any legal rationale for continuing to deprive Plaintiff of her home—thereby violating both statutory due process and

8

Plaintiff's Fourteenth Amendment right to property, liberty, and familial association.

10. The vacate order's extension had catastrophic consequences: Plaintiff was rendered homeless, stalked by her abuser while living in her car, her business was destroyed, and she was forcibly separated from her child. By weaponizing a protective statute against the very person it was intended to protect, Judge Sandman engaged in a judicially sanctioned abuse of discretion that undermined the purpose of Chapter 209A, violated Massachusetts constitutional guarantees (Art. I and Art. X), and triggered federal constitutional scrutiny under *Matthews v. Eldridge*, 424 U.S. 319 (1976), which mandates individualized findings before deprivation of a protected interest.

11. Such conduct is not shielded by judicial immunity where the judge's actions are taken in clear absence of jurisdiction or for a nonjudicial purpose, as outlined in *Mireles v. Waco*, 502 U.S. 9 (1991). Here, the retaliatory nature of the order, the lack of procedural safeguards, and the absence of lawful findings demonstrate a deliberate abuse of power taken in excess of judicial authority, and thus actionable under 42 U.S.C. § 1983. Judge Sandman acted in an administrative capacity by coercively managing court operations and allowing non-judicial actors to enforce bodily surveillance protocols outside the context of any formal judicial process.

12. Judge Sandman explicitly acknowledged on the record within the first month of proceedings that Plaintiff was not an alcoholic, based on both documentary evidence and toxicology results then available. This judicial finding should have ended all alcohol-related scrutiny. Yet, in direct contradiction of her own ruling, Judge Sandman permitted Attorney David Sharp—acting as a judge through unlawful empowerment by Judge Sandman— to unilaterally impose, dictate, and enforce a series of invasive and punitive

9

sobriety testing protocols against Plaintiff.

13. These testing demands included urine screening, hair follicle testing, and breathalyzer monitoring, which not only lacked judicial oversight but were not grounded in any medical diagnosis, expert recommendation, or statutory authority. No evidentiary hearing was held to justify these intrusions, and no formal court order articulated a compelling interest that would justify the infringement of Plaintiff's bodily autonomy and liberty interests.

14. This conduct constituted a gross violation of Plaintiff's substantive due process rights under the Fourteenth Amendment, particularly her right to privacy in medical decision-making (*Washington v. Harper*, 494 U.S. 210 (1990); *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261 (1990)), and her right to be free from state-imposed stigma and compelled medical intervention absent due process.

15. Judge Sandman's failure to safeguard Plaintiff's constitutional rights and instead defer to the adversarial demands of opposing counsel—absent lawful delegation or statutory authority—violated Canon 1 and Canon 2 of the Massachusetts Code of Judicial Conduct, and rendered the court an instrument of retaliatory coercion. It also constituted constructive delegation of judicial authority to a non-neutral private actor, in violation of basic procedural norms.

16. Furthermore, these actions contributed to material harm: Plaintiff, under psychological duress, began dehydrating herself to influence test results, resulting in kidney damage and lasting health consequences, all to comply with baseless requirements driven by litigation strategy, not medical necessity. Elevated creatinine levels were deemed as flushing by Attorney Sharp and Judge Sandman, but are due to the opposite. Plaintiff began dangerously dehydrating herself due to this, which only elevated creatinine levels and

10

caused further abusive litigation in court.

17. Judge Sandman and Attorney Sharp never corrected this for the record and refused medical evidence to further harm Plaintiff's health, stability, and relationship with her daughter.

18. Such judicial abdication and complicity in abuse are not protected by judicial immunity, because they were administrative and retaliatory in nature, and not part of any legitimate adjudicatory function (*Forrester v. White*, 484 U.S. 219 (1988)).

19. These requirements included repeated, highly invasive chemical testing protocols, such as randomized urinalysis, hair follicle analysis, and breathalyzer monitoring, all imposed without individualized suspicion, without medical diagnosis or professional recommendation, and without lawful judicial authorization. At no time was there a finding by the court of probable cause, reasonable suspicion, or compelling need that would justify these bodily intrusions under either state law or federal constitutional standards. Such compelled biological testing, carried out in the absence of due process or court-ordered necessity, violated Plaintiff's rights under the Fourth Amendment to the United States Constitution, which protects individuals from unreasonable searches and seizures. The Supreme Court has long held that bodily intrusions, especially involving the collection of biological material, require heightened justification due to their invasive nature. See *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989); *Chandler v. Miller*, 520 U.S. 305 (1997) (invalidating drug tests without individualized suspicion); and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001) (holding that hospital drug testing without patient consent violated Fourth Amendment).

20. Further, these intrusions were not carried out by a neutral medical authority or by the court itself, but were demanded and enforced by opposing counsel (Attorney Sharp),

11

who had no statutory or ethical authority to impose medical surveillance or regulate Plaintiff's bodily autonomy. Judge Sandman's repeated deference to these demands, despite the absence of legal justification, amounted to constructive delegation of judicial authority to a private actor and state-sanctioned coercion, thereby bringing these constitutional violations squarely within the purview of 42 U.S.C. § 1983

21. These Fourth Amendment violations were further aggravated by the chilling effect imposed on Plaintiff's constitutionally protected parental rights and freedom from compelled medical procedures. The continued enforcement of this medically baseless regime, despite clear negative toxicology for over seven months, constituted not just a lack of necessity but deliberate and malicious harassment, inflicting physical, psychological, and reputational harm on Plaintiff for no legitimate governmental purpose.

22. Accordingly, the testing protocol imposed in this case fails every constitutional benchmark: it lacked probable cause, judicial oversight, neutral enforcement, medical necessity, and procedural safeguards—thereby constituting an ongoing unlawful search and seizure in violation of Plaintiff's clearly established rights.

23. After Plaintiff submitted seven consecutive months of negative toxicology results, including the most invasive form of chemical screening—hair follicle testing, which evidences a 90 day window of substance-free physiology—Judge Sandman nonetheless permitted Attorney David Sharp to again unilaterally impose breathalyzer testing on Plaintiff. This occurred without any new allegations, without material evidence suggesting relapse, and without convening an adversarial evidentiary hearing, as constitutionally required.

12

24. This judicial action was not only arbitrary but stood in direct contradiction to Judge Sandman's own prior findings—namely, her on-record acknowledgment that Plaintiff was not suffering from alcohol use disorder. The reimposition of sobriety testing in the absence of individualized suspicion or due process represented an unlawful reversal of judicial findings without notice, briefing, or cause, thereby violating the Due Process Clause of the Fourteenth Amendment and the doctrine of estoppel where a party cannot be subjected to renewed state-imposed intrusions without change in factual predicate or legal status.

25. Further, this act facilitated a pattern of retaliatory legal harassment, not supported by evidence but designed to preserve the coercive control dynamic advanced by opposing counsel. By empowering Attorney Sharp—an adversarial party—to dictate medical testing protocols post finding, the Court enabled a non-state actor to weaponize the court's enforcement machinery for private retaliation, implicating due process violations and rendering the court a tool of private oppression, as prohibited in *Shelley v. Kraemer*, 334 U.S. 1 (1948).

26. This constitutes not only a violation of Plaintiff's bodily autonomy and unreasonable search and seizure under the Fourth Amendment, but also a violation of her right to familial association and to be free from state-sponsored stigmatization and coercing Plaintiff to comply to get access to her child, as articulated in *Santosky v. Kramer*, 455 U.S. 745 (1982), and *Troxel v. Granville*, 530 U.S. 57 (2000).

27. Judge Sandman coerced Plaintiff to drop multiple contempt of court filings, despite her abuser being consistently in contempt of court for nearly a year. Hearings were postponed, moved, or cancelled. On October 17th, 2025, Plaintiff was set for an

13

evidentiary hearing in District Court. Attorney Sharp that same morning, despite having 1.5 months to prepare, filed to have the hearing moved to Family Court – where Judge Sandman would knowingly favor Sharp.

28. Sandman then made all witnesses and my attorney wait until 3pm to be heard, only one witness was heard, no evidence was allowed except the bodycam footage – and I asked Judge Sandman if I looked impaired in any way. Judge Sandman immediately retaliated and was visibly angry, she extended the vacate order 90 days, ended the hearing without my other witnesses and evidence, forced me to drop the contempt of court, and destroyed my due process and attempts to be safe from violence.

29. In total, the act of re-imposing testing without basis, hearing, or legal findings is emblematic of structural bias, procedural abuse, and judicial retaliation, and falls outside the shield of judicial immunity, as it was administrative, retaliatory, and performed in clear absence of lawful authority (*Mireles v. Waco*, 502 U.S. 9 (1991); *Forrester v. White*, 484 U.S. 219 (1988)).

30. This conduct—permitting unfounded, invasive testing without legal basis, excluding Plaintiff's witnesses and evidence, and extending punitive orders absent findings— violates the core principles of judicial neutrality and shocks the conscience under applicable due process standards. The Constitution requires judges to remain impartial arbiters, not participants in adversarial strategy. By repeatedly deferring to Attorney Sharp's extrajudicial demands, ignoring the absence of evidentiary support, and issuing orders that inflicted harm on Plaintiff without justification, Judge Sandman abandoned the required standard of neutrality and instead acted with bias and prejudice against a litigant engaging in protected constitutional activity.

31. These acts further constitute unlawful retaliation under 42 U.S.C. § 1983, which provides a remedy against any state actor who deprives a person of constitutional rights under color of law. Courts have long held that retaliation for exercising First Amendment rights—including the right to petition the government, to access the courts, and to seek protective relief from abuse—is a clear constitutional violation. See *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018).

32. Moreover, this judicial conduct is actionable under 42 U.S.C. § 1985(3), which prohibits conspiracies to interfere with civil rights, including conspiracies to deter, hinder, or punish individuals for asserting constitutional claims in court. Plaintiff's efforts to obtain a protective order, present exculpatory evidence, and challenge the abusive legal tactics of opposing counsel were not only constitutionally protected, but targeted by Judge Sandman's punitive responses in concert with Attorney Sharp and other defendants. The retaliatory expansion of legal burdens on Plaintiff—absent cause and following protected litigation conduct—meets the standard for invidious discriminatory animus and retaliatory purpose under § 1985(3), particularly where actions were designed to suppress Plaintiff's legal advocacy and deprive her of equal access to justice.

33. Accordingly, Judge Sandman's actions are not merely errors of judgment; they amount to deliberate constitutional violations that pierced the veil of judicial immunity and give rise to personal liability for retaliation, conspiracy, and deprivation of civil rights under federal law. The judicial actions described herein—particularly the obstruction of Plaintiff's evidentiary rights, the imposition and reimposition of punitive sobriety testing without due process, and the baseless extension of a vacate order—were not judicial in

nature, did not derive from any valid jurisdictional authority, and were executed in a manner that was retaliatory, adversarial, and punitive, thereby removing them from the protection of absolute judicial immunity.

34. Under federal law, judicial immunity is not absolute. The United States Supreme Court has consistently held that judges are not shielded when they act in the clear absence of all jurisdiction or when their acts are nonjudicial in nature. See *Forrester v. White*, 484 U.S. 219, 227 (1988) (judges are not immune for administrative acts, even if taken in a judicial capacity); *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (no immunity for actions not taken as part of normal judicial function).

35. In the present matter, the challenged conduct was not an exercise of neutral adjudication, but rather acts of retaliatory punishment and extrajudicial enforcement designed to suppress Plaintiff's constitutional exercise of her right to seek protection, to parent, and to challenge unlawful interference. Judge Sandman did not simply err in judgment—she abandoned the judicial role and entered the fray as an active participant in an unlawful scheme to isolate and discredit Plaintiff, acting in concert with opposing counsel and other state agents to impose burdens unsupported by law or evidence. Examples include:

- Permitting an opposing attorney to impose sobriety monitoring without any motion, hearing, or evidentiary predicate.
- Ignoring negative toxicology and medical records in favor of unsworn allegations.
- Excluding Plaintiff's witnesses and exhibits without procedural justification.
- Repeatedly violating M.G.L. c. 209A by extending vacate orders without findings of current danger, and forced Plaintiff into further danger.
- Failing to issue required findings as mandated by statute and the Abuse

Prevention Benchbook.

These acts were not part of any legitimate judicial adjudication and instead constituted unlawful administrative and retaliatory conduct, performed outside her jurisdiction and in violation of clearly established rights. As such, Judge Sandman is not entitled to judicial immunity, and is personally liable under 42 U.S.C. § 1983 for damages arising from these unconstitutional acts.

36. It is a well-established principle that judicial immunity is not absolute, and it does not extend to non-judicial acts or to acts performed in the clear absence of jurisdiction. As affirmed by the U.S. Supreme Court in *Forrester v. White*, 484 U.S. 219, 227 (1988), "The immunity is overcome in only two sets of circumstances: (1) nonjudicial actions, i.e., actions not taken in the judge's judicial capacity; and (2) actions, though judicial in nature, taken in the complete absence of all jurisdiction." Similarly, in *Mireles v. Waco*, 502 U.S. 9 (1991), the Court emphasized that judicial immunity does not protect acts that are manifestly outside the scope of judicial authority or performed for purposes unrelated to any judicial function.

37. In this case, Judge Sandman's conduct was neither judicial in nature nor jurisdictionally authorized. Her repeated delegation of legal enforcement powers to a non-judicial, adversarial third party—Attorney David Sharp—amounted to an abdication of the judicial role and a clear denial of due process. The Constitution requires that any restriction on a litigant's liberty or bodily autonomy be imposed through lawful judicial procedures, with findings, evidence, and adversarial process. Instead, Judge Sandman allowed a private attorney to act with quasijudicial authority, dictating testing regimens, medical conditions, and punitive consequences, without court orders, medical basis, or legal justification.

38. These administrative, retaliatory, and discriminatory decisions—including permitting

17

continued surveillance and bodily intrusion after the court had acknowledged Plaintiff's sobriety—fall outside the protective scope of judicial immunity. They were executed not in the capacity of adjudicating disputes, but to punish Plaintiff for exercising her right to seek protection, parent her child, and challenge state misconduct—protected activities under the First and Fourteenth Amendments.

39. By facilitating the coercive control of a litigant by opposing counsel, and refusing to apply neutral judicial standards to Plaintiff's case, Judge Sandman denied Plaintiff access to a fair and impartial tribunal, violating the Due Process Clause of the Fourteenth Amendment, and acting in clear absence of lawful authority. These actions were not merely legally erroneous; they were extra-judicial, punitive, and discriminatory in nature—thus subjecting her to personal liability under 42 U.S.C. § 1983.

40. Judge Sandman's behavior also violated established procedural standards set forth in the Massachusetts Probate and Family Court Bench Guide, which serves as an internal judicial resource for managing protective orders, parental fitness determinations, and evidentiary protocols. These standards are not advisory; they reflect binding principles rooted in statutory mandates, due process, and uniform judicial administration. Her repeated failure to comply with these guidelines deprived Plaintiff of a fair forum and consistent application of law, creating the appearance—and reality—of bias.

41. Regarding protective orders under M.G.L. c. 209A, the Bench Guide requires judges to assess the credibility of allegations through live testimony, weigh current risk of harm, and issue findings of fact supported by evidence. Judge Sandman failed to adhere to these requirements by excluding key witnesses and exculpatory documentation, then extending a vacate order against Plaintiff by 90 days without making any findings as to

current danger or necessity, in direct violation of Section III(D) of the Abuse Prevention Benchbook and M.G.L. c. 209A, § 3 and § 4.

42. In the context of parental fitness evaluations and custodial decision-making, the Bench Guide emphasizes individualized assessment, neutrality, and the necessity of qualified expert input—particularly where allegations of substance use or mental health issues are made. Instead, Judge Sandman substituted adversarial advocacy by Attorney Sharp for expert testimony, and allowed him to unilaterally impose conditions tantamount to court orders without court authorization. No court-appointed evaluator made findings of unfitness, and the Court relied exclusively on non-expert, adversarial accusations, contrary to the standards outlined in Rule 5 of the Uniform Practices of the Probate and Family Court and commentary within the Bench Guide.

43. Moreover, with respect to evidentiary hearings, the Bench Guide and Massachusetts Rules of Domestic Procedure require adherence to fundamental due process: notice, opportunity to be heard, and the right to present and confront evidence. Judge Sandman denied Plaintiff this opportunity on multiple occasions, either by excluding her evidence outright, or by failing to conduct adversarial hearings before issuing liberty-depriving orders. Such conduct violated not only court procedure, but the Fourteenth Amendment's guarantee of fair process and Massachusetts constitutional guarantees under Articles I, X, and XII.

44. Accordingly, these departures from the procedural architecture of the Massachusetts Probate and Family Court Bench Guide render Judge Sandman's actions unlawful, retaliatory, and discriminatory, and strip any claim to judicial immunity for acts committed outside established judicial protocol.

45. Judge Sandman's misuse of judicial authority directly and materially contributed to the Plaintiff's ongoing injury, both legally and factually. Her decisions were not neutral applications of law, but active facilitation of a coercive legal environment that compounded Plaintiff's victimization and inflicted multidimensional harm. By excluding exculpatory evidence, denying Plaintiff the right to call witnesses, and extending punitive orders without findings or hearings, Judge Sandman enabled a continuing regime of state-sanctioned coercion that deprived Plaintiff of her most basic rights—including the constitutionally protected right to parent, as recognized under the Fourteenth Amendment, and affirmed in *Troxel v. Granville*, 530 U.S. 57 (2000). This judicially endorsed interference prolonged Plaintiff's separation from her child, despite no adjudication of unfitness and no evidence of imminent harm, in violation of both federal and state substantive due process standards.

46. In addition to the loss of parental companionship, Plaintiff suffered extreme emotional trauma, as she was forced to navigate an intentionally hostile and biased legal process, where the judge enabled and even amplified the abusive tactics of her adversary. Emotional distress was not incidental—it was foreseeable and causally linked to the court's decisions, particularly those that allowed an opposing attorney to impose intrusive medical surveillance without cause.

47. The resulting financial ruin—including forced homelessness, destruction of Plaintiff's home business, and lost access to assets—was a direct outcome of Judge Sandman's unlawful extension of a vacate order without legal justification, an act that functioned as a constructive eviction without any of the procedural protections guaranteed under state property and family law. See *Armstrong v. Manzo*, 380 U.S. 545 (1965) (procedural due

20

process demands notice and hearing before deprivation of significant interests).

48. Most egregiously, Plaintiff endured physical harm, including kidney damage and systemic dehydration, as a result of the baseless testing regime imposed under the Court's authority. Judge Sandman's refusal to halt that regime—even after acknowledging there was no evidence of substance use—elevates her conduct from misjudgment to deliberate indifference, thereby meeting the standard for constitutional harm under *Farmer v. Brennan*, 511 U.S. 825 (1994).

49. Each of these injuries—familial, emotional, financial, and physical—were the foreseeable, proximate, and unlawful consequence of judicial actions that lacked jurisdictional legitimacy and procedural integrity. These harms are ongoing and compounding, and entitle Plaintiff to compensatory, declaratory, and punitive relief under 42 U.S.C. § 1983, § 1985(3), and applicable state tort doctrines.

50. This persistent and escalating pattern of judicial abuse and procedural misconduct forms the core of Plaintiff's claims under Count I (Violation of Civil Rights – 42 U.S.C. § 1983), Count II (Civil Conspiracy – 42 U.S.C. § 1985(3)), Count III (Violation of Due Process – Fourteenth Amendment), Count IV (Retaliation for Protected Conduct), and Count VI (Intentional Infliction of Emotional Distress). Together, these claims assert both constitutional and tort-based liability for the full spectrum of harms that directly flowed from Judge Sandman's unlawful conduct, undertaken in excess of her authority, and in conscious disregard of Plaintiff's rights.

51. Under Count I, Plaintiff asserts that Judge Sandman, acting under color of state law, deprived her of clearly established constitutional rights—including the right to parental autonomy, bodily integrity, property, procedural fairness, and access to justice—without

due process, without lawful findings, under fraudulent filings stating "the marital home" (despite never being married and being an equal and protected investor in the real property), and in violation of binding judicial standards.

52. Under Count II, Plaintiff alleges that Judge Sandman acted in concert with non-state actors (including Attorney David Sharp) and other state agents (including DCF personnel) to engage in a coordinated scheme of retaliation and suppression, designed to isolate, discredit, and punish Plaintiff for exercising constitutionally protected rights. This conspiracy to deny equal protection and due process falls squarely within the prohibitions of § 1985(3).

53. Under Count III, the conduct at issue—blocking witnesses, extending punitive orders without cause, permitting adversarial parties to control court orders, and ignoring exculpatory evidence—constitutes a gross deprivation of Plaintiff's procedural and substantive due process rights under the Fourteenth Amendment, actionable independently under § 1983.

54. Under Count IV, the record reflects a clear causal link between Plaintiff's protected activities (seeking a protective order, asserting parental rights, filing complaints) and the retaliatory actions imposed by the court, including enhanced surveillance, exclusion from her home, and denial of legal protections. Such conduct violates the First and Fourteenth Amendments, both of which prohibit state retaliation against litigants for protected speech and access to the courts.

55. Under Count VI, the cumulative effect of Judge Sandman's actions—particularly when considered alongside the emotional and physical harm intentionally inflicted—meets the high threshold for intentional infliction of emotional distress under Massachusetts law.

22

Her conduct was outrageous, without lawful justification, and calculated to cause harm, and it did in fact result in severe psychological and physical injury.

56. Accordingly, this unified course of conduct is not only egregious in substance, but it is also actionable under federal and state law, and supports the imposition of monetary damages, declaratory relief, and punitive sanctions against the responsible actors in their individual capacities.

**Defendant Officers Tim Budrewicz and Greg Bardwell**

57. Officers Tim Budrewicz and Greg Bardwell, municipal law enforcement officers employed by the Town of Shelburne, Massachusetts, and sued herein in their individual capacities, acted under color of state law when they knowingly and willfully deprived Plaintiff of her clearly established constitutional rights during multiple, documented encounters. Their conduct constitutes a direct violation of 42 U.S.C. § 1983, as well as substantive and procedural due process violations under the Fourteenth Amendment and First Amendment retaliation principles, and supports claims under § 1985(3) for conspiracy to interfere with civil rights.

58. These officers were dispatched in response to Plaintiff's 911 call seeking protection from domestic violence, a context which triggers affirmative duties under both state and federal law. Rather than performing their sworn obligation to protect and intervene, Officers Budrewicz and Bardwell engaged in conduct that facilitated coercive control by Plaintiff's abuser. On body-worn camera footage and other contemporaneous records, both officers can be observed gaslighting Plaintiff, minimizing her expressed fear, and offering her abuser strategic legal advice on how to file a retaliatory custody action and

23

secure a vacate order against her.

59. Within hours of this contact, her abuser—armed with knowledge provided by police—rushed to obtain a temporary order excluding Plaintiff from her own home and seeking full custody of the parties' minor child. Officers Budrewicz and Bardwell, acting in concert with him, directly assisted in this effort, violating their duty to remain neutral law enforcers and transforming into active participants in a malicious legal scheme designed to dispossess and silence the abuse victim.

60. Their conduct shocks the conscience and falls well outside the protection of qualified immunity. In *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), while the Supreme Court declined to impose liability for inaction alone, it distinguished situations where state officials actively assist private actors in harming a constitutional interest. Here, Officers Budrewicz and Bardwell did more than fail to act—they materially assisted in the strategic weaponization of the judicial system against a vulnerable domestic violence complainant. This conduct implicates not only due process and equal protection, but also the First Amendment right to petition for redress and to be free from state retaliation.

61. Further, by discouraging Plaintiff from pursuing lawful remedies, downplaying her 911 call, and publicly siding with her abuser during official investigation, the officers created a state sanctioned chilling effect, suppressing Plaintiff's lawful pursuit of protection and constitutional redress. This qualifies as a custom or usage under Monell v. Dept. of Social Services, 436 U.S. 658 (1978) and imposes personal liability under § 1983.

62. The misconduct of Officers Budrewicz and Bardwell was not negligent or mistaken—it was intentional, coordinated, and conspiratorial, and it caused foreseeable and severe injury to Plaintiff, including the loss of her home, destruction of her reputation,

24

separation from her child, and a chain of retaliatory legal actions that followed.

63. As such, these officers are liable under Count I (§ 1983 Civil Rights Violation), Count II (§ 1985(3) Conspiracy), Count III (Due Process), Count IV (Retaliation), and Count VI (Emotional Distress) for their unconstitutional and tortious conduct.

64. On or around the date of Plaintiff's 911 call requesting urgent law enforcement protection from domestic intimidation, retaliatory abuse, and escalating violence, Officers Tim Budrewicz and Greg Bardwell of the Shelburne Police Department were dispatched to Plaintiff's residence. Although Massachusetts had not yet codified "coercive control" as a statutory cause of action at that time, the totality of circumstances—including Plaintiff's prior reports of intimidation, threats, and <u>physical violence</u> by both her abuser and his dangerous tenant—constituted a clear and actionable case of domestic violence under the legal standards in effect, including M.G.L. c. 209A and relevant Fourth and Fourteenth Amendment precedents.

65. At the time of dispatch, Officers Budrewicz and Bardwell had full access to prior calls for service, knew household dynamics, and Plaintiff reporting dangerous conditions within the shared home. Their duty was not discretionary—it was ministerial: they were legally obligated to investigate impartially, document evidence of abuse, protect the victim, and where necessary, refer the matter for emergency judicial relief. Instead, these officers deliberately minimized the danger, questioned Plaintiff's credibility without basis, and offered her abuser legal advice on how to file a retaliatory custody petition and obtain a vacate order—an act of profound betrayal of public trust and a violation of departmental policies, constitutional norms, and Plaintiff's civil rights. These same officers continued to block Plaintiff from reporting new evidence and further abuse for

several months after she made the fateful mistake of dialing 911 for help on April 22nd, 2024.

66. Body-worn camera footage and contemporaneous documentation reflect that Plaintiff clearly articulated concerns about physical safety, including threats and acts by both her abuser and his tenant. Rather than respond appropriately, Officers Budrewicz and Bardwell aligned themselves with the abuser, engaging in clear gaslighting tactics designed to undermine Plaintiff's credibility and shift the legal advantage to the perpetrator. Within hours of their visit, Plaintiff's abuser—armed with legal guidance from the responding officers—filed for emergency relief in court, resulting in Plaintiff's sudden exclusion from her home and loss of access to her child and property.  Bardwell, for instance, after Plaintiff repeated three times "I am not safe, my daughter is not safe", Bardwell stated "Well it doesn't seem to be happening right now", gaslighting Plaintiff while no violence was happening due to two police officers being in the room.

67. This sequence of events demonstrates not merely failure to protect, but active state complicity in the weaponization of judicial processes against a victim of domestic violence. The officers' conduct violated the spirit and letter of M.G.L. c. 209A, which mandates protection for victims of abuse; Art. 10 and Art. 12 of the Massachusetts Declaration of Rights, which protect individual security and due process; and federal constitutional guarantees under the Fourteenth Amendment, including procedural fairness, bodily autonomy, and access to meaningful legal redress.

68. By siding with the abuser and using their authority to initiate legal harm rather than protective intervention, Officers Budrewicz and Bardwell stepped beyond their role as neutral public servants and entered the realm of constitutional tortfeasors, liable under

42 U.S.C. § 1983 for unlawful deprivation of rights under color of state law.

69. While visibly outfitted with active body-worn cameras—devices intended to ensure transparency, accountability, and accurate documentation of police interactions—Officers Tim Budrewicz and Greg Bardwell deliberately engaged in private, unrecorded communications with Plaintiff's abuser immediately after taking Plaintiff's statement. These off-record exchanges, conducted either by muting the body-worn cameras or by intentionally stepping out of frame and earshot, constituted an intentional circumvention of transparency protocols, and raise serious constitutional and evidentiary concerns regarding the officers' role in facilitating subsequent state action against Plaintiff.

70. The timing and nature of these clandestine conversations—occurring minutes after Plaintiff disclosed ongoing domestic intimidation and requested protective intervention—underscore their deliberate character and retaliatory purpose. Within hours of these unrecorded meetings, Plaintiff's abuser, now armed with legal strategy and procedural direction apparently obtained from Officers Budrewicz and Bardwell, filed an emergency petition for full custody and a 209A vacate order against Plaintiff. These filings were not only factually baseless but executed in direct retaliation for Plaintiff's 911 call, forming the cornerstone of a malicious judicial campaign that would lead to her forced removal from the home, loss of access to her child, and long-term deprivation of liberty and property.

71. The officers' decision to withhold documentation of these interactions violates not only internal police department regulations regarding body-worn camera use, but also Plaintiff's constitutional right to procedural due process under the Fourteenth Amendment, and her First Amendment right to petition the government for protection

without state retaliation. See *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) (First Amendment retaliation actionable where adverse state action follows protected speech, even if other causes exist).

72. Moreover, this behavior constitutes state facilitation of private abuse—an actionable theory of liability under § 1983 where state actors knowingly aid private individuals in violating constitutional rights. See *Dennis v. Sparks*, 449 U.S. 24 (1980). The intentional concealment of communications and immediate use of information therein to initiate coercive judicial proceedings against a domestic violence complainant presents a textbook case of color-of-law conspiracy to deprive rights, actionable under both 42 U.S.C. § 1983 and § 1985(3).

73. These off-record communications also interfere with Plaintiff's access to evidence and compromise her ability to challenge the constitutionality of resulting judicial actions. The officers' conduct obliterated the factual record needed for Plaintiff to obtain meaningful legal relief, thereby violating her right to a fair adjudication and judicial integrity.

74. Accordingly, these actions—premeditated, retaliatory, and conspiratorial in nature—strip Officers Budrewicz and Bardwell of qualified immunity and expose them to full individual liability under federal civil rights law.

75. Officers Tim Budrewicz and Greg Bardwell, acting under color of state law and in their individual capacities, were captured on body-worn camera footage providing affirmative legal guidance and procedural strategy to Plaintiff's abuser—an act that constitutes the unauthorized practice of law, a violation of ethical boundaries, and a blatant breach of their constitutional duty to remain neutral public servants.

76. In particular, the video evidence reveals both officers explaining how to petition the Probate and Family Court, advising the abuser on which relief to seek, including emergency full custody and vacate orders, and discussing procedural timing and documentation strategy. Such actions are not merely improper—they are expressly prohibited by Massachusetts law, which holds that only licensed attorneys may dispense legal advice, particularly in adversarial family law matters. See *M.G.L. c. 221, § 46A* (unauthorized practice of law statute), which defines the unlawful practice of law to include "advising or counseling... in matters involving legal rights or remedies."

77. By assuming the role of legal advisors to one party in a domestic dispute, Officers Budrewicz and Bardwell abandoned their sworn duty to act impartially, and instead became active agents of litigation strategy, tipping the scales of justice against Plaintiff and turning a law enforcement response into a state-enabled legal ambush. Their conduct constitutes a conflict of interest of the highest order, as they were charged with responding to Plaintiff's call for protection and instead assisted her abuser in launching an immediate retaliatory campaign through the courts.

78. This weaponization of state authority in support of one private litigant is a violation of the Fourteenth Amendment's Due Process Clause, which guarantees all persons a fair, neutral, and unbiased legal process. See *Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009)* (requiring disqualification where neutrality is compromised). It also infringes upon Plaintiff's First Amendment right to petition the government for redress without retaliation, and her Fourteenth Amendment right to access courts on equal footing.

79. Furthermore, their unauthorized legal advice enabled the rapid filing of facially defective motions that dispossessed Plaintiff of her home, child, and property without hearing,

evidence, or judicial scrutiny. The foresee-ability of this outcome imposes proximate causation liability under § 1983, and their intentional assistance to a private party in misusing judicial process constitutes conspiratorial action under § 1985(3).

80. This conduct is egregious, retaliatory, and systemic. It transforms neutral police officers into quasi-legal actors functioning outside the scope of their lawful authority, eliminating any claim to qualified immunity and establishing a clear pathway for federal civil rights liability.

81. Rather than documenting Plaintiff's report of abuse and fulfilling their statutory duty under M.G.L. c. 209A, § 6—which requires officers responding to domestic violence to accurately record statements, document injuries, collect relevant evidence, and assist victims in obtaining protective orders—Officers Tim Budrewicz and Greg Bardwell repeatedly discredited Plaintiff, minimized her reports of danger, and misrepresented the availability of legal remedies, falsely telling her that she had "no recourse" and implying that law enforcement would not intervene on her behalf. This refusal was not isolated to the date of Plaintiff's 911 call; it continued for months afterward, during which time Plaintiff made additional attempts to report escalating threats, property damage, intimidation, and new evidence corroborating the ongoing abuse.

82. Instead of reassessing the situation in light of new information—as required by trauma informed policing standards, the Massachusetts Model Domestic Violence Police Policy, and basic constitutional obligations—Officers Budrewicz and Bardwell dismissed each subsequent plea for help, often responding with overt gaslighting, insinuating that Plaintiff was overreacting, unstable, or misinterpreting events. Their persistent refusal to acknowledge new evidence—including photographs, witness statements, toxicology

30

results, and documentation of threats from both the abuser and his tenant—constituted an ongoing deprivation of Plaintiff's right to equal protection and meaningful access to protective services.

83. Their conduct violated not only statutory mandates, but also Plaintiff's rights under the Fourteenth Amendment, which prohibits state actors from arbitrarily denying protective services to certain citizens while providing them to others. See *Estate of Macias v. Ihde*, 219 F.3d 1018 (9th Cir. 2000) (police violate equal protection when they systematically discredit or refuse to assist domestic violence victims). By continually disregarding Plaintiff's evidence and refusing to take even minimal investigative steps, the officers created a state-sanctioned environment of danger, emboldening the abuser and directly contributing to the sequence of retaliatory court actions that followed.

84. Further, their repeated statements that "nothing can be done" and that Plaintiff "has no recourse" were factually false and intentionally obstructive, given that M.G.L. c. 209A grants police an affirmative duty to assist victims in seeking emergency protective orders. Their refusal to carry out these duties—while simultaneously providing legal strategy to the abuser—constitutes a gross abuse of authority, falling squarely within the definition of state-enabled discrimination, retaliation, and deprivation of civil rights actionable under 42 U.S.C. § 1983.

85. Over time, this pattern of dismissiveness, gaslighting, and willful refusal to consider new evidence deprived Plaintiff of both her constitutional right to bodily safety and her right to petition for government protection without retaliation, while enabling her abuser to escalate his coercive control and domestic violence with police support. The foreseeable result was the deprivation of Plaintiff's home, her parental rights, and her

31

physical safety—injuries directly traceable to the officers' sustained, unlawful conduct.

86. This sustained course of conduct by Officers Tim Budrewicz and Greg Bardwell constitutes deliberate indifference to Plaintiff's constitutional rights, a standard of liability long recognized under 42 U.S.C. § 1983 for state actors who knowingly disregard a substantial risk of harm to an individual under their jurisdiction. By refusing to investigate, dismissing credible reports of domestic violence, ignoring material new evidence, and affirmatively aiding the perpetrator of abuse, the officers engaged in a conscious disregard for Plaintiff's safety, liberty, and parental rights, amounting to a gross deviation from professional norms and constitutional obligations.

87. The officers' conduct violated clearly established law under the Fourteenth Amendment in at least two independent respects:

- Procedural Due Process: By failing to take Plaintiff's complaints seriously, refusing to document key facts, and enabling the swift legal dispossession of her home and child through coordinated retaliation, the officers denied Plaintiff a meaningful opportunity to be heard and undermined the integrity of the legal process. Their active obstruction of state remedies and deprivation of access to fair procedures constitutes a textbook violation of *procedural due process*. See *Zinermon v. Burch*, 494 U.S. 113 (1990) (procedural due process protects against arbitrary government action depriving individuals of liberty or property).

- Equal Protection: Their conduct also violated the Equal Protection Clause, which guarantees that similarly situated individuals be treated alike. Domestic violence victims, and particularly women seeking protection against male abusers, are a recognized class entitled to equal protection. Courts have found equal protection

32

violations where police systematically fail to enforce protective laws or treat domestic abuse victims differently from others reporting crimes. See *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990); *Hinchy v. Police Dep't of the City of New York*, 2020 WL 2836771 (E.D.N.Y. 2020). Here, the officers' refusal to act, despite overwhelming indications of danger, created a de facto policy of selective enforcement, exposing Plaintiff to further harm.

88. As a result, Plaintiff's injuries—loss of home, parental access, physical safety, and reputation—were not incidental, but rather directly caused by the officers' unconstitutional actions and omissions. The deliberate indifference standard is clearly met where police had actual knowledge of serious risks and chose to ignore them, especially while simultaneously enabling and advising the abuser. This strips the officers of qualified immunity and subjects them to personal liability under § 1983.

89. Officers Tim Budrewicz and Greg Bardwell also violated the Massachusetts Executive Office of Public Safety and Security's Model Policy and Procedures for Police Response to Domestic Violence, a binding framework adopted statewide to ensure uniform, trauma-informed, and legally compliant responses to domestic abuse incidents. This Model Policy— expressly adopted to implement the requirements of M.G.L. c. 209A and constitutional due process protections—requires that law enforcement officers:

- Recognize signs of coercive control and emotional abuse, not just physical violence;
- Immediately investigate any claims of domestic violence or retaliation;
- Arrest the dominant aggressor where probable cause exists;
- Collect evidence, including victim and witness statements;
- File a complete and accurate incident report, regardless of whether an arrest is made;

33

- Refer victims to appropriate legal and medical services and explain their right to seek protective orders.

90. In this case, despite being dispatched on an emergency call from a victim of domestic intimidation and property interference, Officers Budrewicz and Bardwell failed on all of these fronts. They did not arrest or even question the abuser meaningfully, despite prior documented incidents of violence, ongoing property control, and third-party safety concerns involving the abuser's tenant. They ignored Plaintiff's description of coercive behaviors, including threats, forced control over living arrangements, and retaliation for protected acts of speech and petitioning. They failed to document the incident appropriately, omitting critical facts and evidence from their report, thereby obstructing subsequent legal proceedings and severely prejudicing Plaintiff in court. Officers Bardwell and Budrewicz failed to record and investigate further abuse, continued to gaslight Plaintiff, and rendered her incapable of seeking help from other police departments.

91. These failures constitute a systematic disregard for state-mandated policing standards. They are not merely procedural oversights, but substantive violations that deny a victim meaningful access to legal protection, constituting state-enabled continuation of abuse. Massachusetts courts and administrative agencies have recognized that violations of this model policy may form the basis of civil liability, particularly where they result in the deprivation of statutory protections under M.G.L. c. 209A or contribute to ongoing harm – which included discrediting her to state police and the District Attorney.

92. Moreover, the officers' conduct conflicts with their constitutional obligations under the Fourteenth Amendment. In Gonzales v. Castle Rock, 545 U.S. 748 (2005), while the

Supreme Court limited procedural due process claims for failure to enforce restraining orders, it left open—and lower courts have since recognized—that affirmative misconduct by police that worsens a known danger or creates new harm may give rise to § 1983 liability.

93. Here, Officers Budrewicz and Bardwell not only failed to protect, but assisted the abuser, making their policy violations both legally and constitutionally actionable.

94. The violation of this model policy, especially when performed in deliberate disregard of Plaintiff's rights, supports Plaintiff's claims under 42 U.S.C. § 1983 for deprivation of due process, equal protection, and bodily security, and forms a critical part of her municipal and individual liability claims.

95. The misconduct of Officers Tim Budrewicz and Greg Bardwell had immediate and devastating consequences, both legally and personally, for Plaintiff. Their decision to side with her abuser, refuse to investigate or intervene, and instead provide him with strategic legal advice directly enabled that abuser to secure emergency temporary custody of the parties' child and obtain a court-ordered vacate of the shared home, all within hours of Plaintiff's 911 call seeking protection. These state-facilitated legal maneuvers—founded not on evidence but on officer-aided retaliation—resulted in the immediate dispossession of Plaintiff's housing and parental rights, triggering a catastrophic downward spiral in her life.

96. As a direct and foreseeable consequence of this conduct:

- Plaintiff was rendered homeless, with no time to prepare or retrieve belongings, leading to the destruction of personal property, the collapse of her home-based business, and a complete disruption of her economic stability;

- She was forcibly and wrongfully separated from her minor daughter, without a hearing, a judicial finding of unfitness, or any meaningful opportunity to contest the abuser's claims, violating both her substantive due process rights to family integrity and her procedural due process right to be heard;

- She was branded in court and by state actors as unstable, uncooperative, or unfit, based not on facts or evidence, but on a narrative manufactured in part by the police officers' refusal to document the abuse, their suppression of exculpatory information, and their support of retaliatory legal filings.

97. This constitutes not merely reputational harm, but a "stigma-plus" constitutional injury under Paul v. Davis, 424 U.S. 693 (1976), where reputational harm is accompanied by the deprivation of a protected liberty or property interest—in this case, Plaintiff's parental rights, access to her home, and bodily security.

98. Plaintiff's emotional and psychological injuries include complex PTSD, anxiety, physical health deterioration, and prolonged trauma from being wrongfully excluded, mischaracterized, and subjected to coercive court processes built on false pretenses. The loss of housing, income, access to healthcare, and reputation have had long-term compounding effects, leaving Plaintiff in extensive debt, without a stable home, and enduring irreparable disruption to her relationship with her daughter, and forced her daughter to endure further abuse by their abuser and the dangerous tenant (that regularly had a drug dealer visit the home).

99. The officers' role in setting this chain of events in motion—and in refusing to remedy the situation despite later presentations of new evidence—renders them directly liable under 42 U.S.C. § 1983 for proximate constitutional injury. See Monroe v. Pape, 365

U.S. 167 (1961) (Section 1983 designed to afford redress for all injuries resulting from unconstitutional conduct by persons acting under color of state law). This includes both compensatory and punitive damages, as their actions were not merely negligent but willful, malicious, and conducted with reckless disregard for Plaintiff's federally protected rights.

100.    Plaintiff therefore seeks recovery for:

- Economic losses: including lost business revenue, destroyed property, and costs of displacement;

- Emotional distress: including psychological trauma, therapy, and medical treatment;

- Loss of familial association: under federal due process guarantees;

- Reputational damage: with legal consequences stemming from false public narratives;

- Punitive damages: to deter future abuse of police authority and hold Defendants accountable for unconstitutional retaliation against victims of domestic violence.

101.    These acts were not the product of mere negligence, error in judgment, or good-faith discretion. Rather, the conduct of Officers Tim Budrewicz and Greg Bardwell was deliberate, retaliatory, and conspiratorial in nature, demonstrating an intentional abuse of authority under color of state law. Their actions cannot be excused as oversight—they reflect a knowing alliance with Plaintiff's abuser, executed with the purpose of undermining Plaintiff's legal standing, credibility, and access to protections guaranteed under state and federal law.

102.    From the moment of their first contact with Plaintiff, the officers chose not to act as neutral investigators or enforcers of the law, but instead to assist and empower her

abuser, guiding him in the misuse of court procedures for retaliatory purposes. This included helping the abuser rapidly obtain temporary full custody and a 209A vacate order against Plaintiff without notice, legal basis, or evidentiary foundation. The officers' involvement went beyond omission—they provided procedural coaching, credibility reinforcement, and narrative support for the abuser's filings, while simultaneously suppressing Plaintiff's evidence, minimizing her injuries, and misrepresenting her options.

103.    This constitutes a concerted plan of action carried out in tandem with a private individual to use state power as a weapon against a protected person, in violation of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments. It meets every element of a civil conspiracy under 42 U.S.C. § 1985(3):

- There was a meeting of the minds between state actors and a private party (the abuser);

- The conspiracy was motivated by retaliatory animus against Plaintiff's exercise of her rights (including calling 911 and seeking protection);

- An overt act was taken in furtherance of the conspiracy (legal advice, muted conversations, coordination of filings); and

- Plaintiff suffered injury to federally protected rights, including bodily security, parental rights, property access, and due process.

104.    The material connection between the officers' conduct and Plaintiff's subsequent deprivation of rights is clear and direct. But for their active collaboration and obstruction of duty, the abuser would not have had the institutional leverage, false legitimacy, or procedural knowledge to so swiftly and successfully displace Plaintiff from her home and

38

child. These constitutional injuries are not incidental—they are the foreseeable and intended result of an unlawful agreement between state officials and a private actor, executed under color of law and designed to silence, punish, and destabilize Plaintiff.

105. As such, qualified immunity does not apply, and the officers are individually liable under § 1983 and § 1985(3) for participating in a scheme to deprive Plaintiff of her rights through state facilitated domestic retaliation and legal sabotage.

106. Qualified immunity does not shield government officials—such as municipal police officers—from liability when their conduct violates clearly established constitutional rights of which a reasonable person would have known. The doctrine is not a license for public officials to act with impunity; it exists to protect only those who make reasonable, good-faith mistakes in legally ambiguous situations—not those who knowingly trample upon settled law.

107. As articulated in Hope v. Pelzer, 536 U.S. 730 (2002), the Supreme Court held that qualified immunity is inapplicable where the unlawfulness of the official's conduct is readily apparent in light of pre-existing law. The Court emphasized that public officials "can still be on notice that their conduct violates established law even in novel factual circumstances," so long as the constitutional violation is clearly established by "controlling authority or a robust consensus of persuasive authority."

108. Likewise, in Graham v. Connor, 490 U.S. 386 (1989), the Court reaffirmed that the reasonableness of an officer's actions must be judged against the "clearly established constitutional protections" guaranteed by the Fourth and Fourteenth Amendments. The conduct of Officers Budrewicz and Bardwell—knowingly ignoring domestic violence, aiding the abuser's legal retaliation, obstructing access to protective orders, and refusing

39

to consider exculpatory evidence—exceeded the bounds of objectively reasonable police behavior and violated long-standing legal standards protecting victims of state-enabled abuse.

109.  At the time of the events in question, it was clearly established that:

- Victims of domestic violence are entitled to equal enforcement of the law and nondiscriminatory access to state protection (see *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990));

- Police officers may not conspire with private individuals to deprive a person of constitutional rights (see *Dennis v. Sparks*, 449 U.S. 24 (1980));

- The unauthorized practice of law by officers and manipulation of judicial process to benefit one private party is unlawful;

- The due process and equal protection clauses prohibit state actors from selectively denying fundamental rights or acting with retaliatory intent.

110.  Accordingly, no reasonable officer could have believed it was lawful to suppress domestic violence complaints, coach the abuser on how to weaponize the legal system, and then refuse to document or investigate Plaintiff's evidence—especially in the face of known risks to Plaintiff's safety, parental rights, and property interests. The totality of their conduct demonstrates not mistake or confusion, but a willful and unconstitutional pattern of abuse, removing any shield of qualified immunity and subjecting them to full civil liability under 42 U.S.C. § 1983.

111.  Officers Tim Budrewicz and Greg Bardwell's actions were not only unlawful—they were the proximate cause of extensive and enduring harm to Plaintiff's life, liberty, and

40

dignity. Under § 1983, proximate cause is established when a defendant's conduct is a substantial factor in bringing about the harm and when the resulting injury is a foreseeable consequence of that conduct. Here, the officers' intentional suppression of evidence, alignment with the abuser, and willful obstruction of Plaintiff's access to state protection mechanisms foreseeably and directly led to a chain of events that devastated Plaintiff's physical, emotional, familial, and financial wellbeing.

112.    As a direct and proximate result of their actions:

- Plaintiff suffered severe emotional and psychological trauma, including complex posttraumatic stress disorder (CPTSD), anxiety, and medical harm. These injuries were exacerbated by the officers' refusal to document abuse, their facilitation of the abuser's retaliatory court filings, and their continued gaslighting and refusal to assist even after the presentation of new, corroborative evidence.

- Plaintiff incurred significant property loss, including the destruction of her home-based business, personal belongings, and access to her residence. By helping the abuser secure a vacate order based on misrepresentations and without investigation, the officers enabled her unlawful dispossession.

- Plaintiff's reputation was irreparably damaged in the eyes of courts, agencies, and third parties. Their failure to document abuse, coupled with their implicit endorsement of the abuser's narrative, resulted in Plaintiff being characterized in official records as unstable, unfit, or uncooperative - stigmatizing her both judicially and socially.

- Most gravely, Plaintiff suffered irreversible harm to her parent–child relationship. Because of the officers' conduct, the abuser gained temporary full

41

custody and was emboldened to pursue an extended campaign of coercion and isolation. This loss of parenting time—without any judicial finding of unfitness or danger—violated Plaintiff's fundamental liberty interest in familial association, recognized as a core substantive due process right under Troxel v. Granville, 530 U.S. 57 (2000) and Santosky v. Kramer, 455 U.S. 745 (1982).

113.   The causal relationship between the officers' conduct and Plaintiff's injuries is not speculative—it is factually grounded, legally direct, and supported by the sequence of events and official records. Had the officers fulfilled their duty under M.G.L. c. 209A, adhered to the Model Domestic Violence Policy, or even acted with basic neutrality, Plaintiff would not have suffered the life-altering losses that followed. Instead, their conduct intentionally altered the legal and factual landscape, stripping Plaintiff of due process protections and granting procedural power to her abuser—resulting in harms that are now permanent.

114.   Accordingly, the officers are liable under 42 U.S.C. § 1983 for all general, special, and punitive damages arising from this pattern of constitutional violations. Their actions were not peripheral but central to the deprivation of Plaintiff's rights and the collapse of her personal security, professional livelihood, and parental identity.

115.   These facts, when taken collectively and viewed in the light most favorable to Plaintiff—as required at the pleading stage—establish a plausible and well-supported basis for liability under multiple constitutional and tort theories. Specifically, they support claims under:

116.   Count I – Violation of Civil Rights under 42 U.S.C. § 1983: Officers Budrewicz and Bardwell, acting under color of law, knowingly deprived Plaintiff of federally

42

protected rights, including her rights to due process, bodily security, access to courts, familial association, and freedom from unlawful search and seizure. Their actions were neither objectively reasonable nor undertaken in good faith, and thus fall squarely within the purview of actionable § 1983 violations. See *Monroe v. Pape*, 365 U.S. 167 (1961); *Graham v. Connor*, 490 U.S. 386 (1989)

117.    Count II – Civil Conspiracy under 42 U.S.C. § 1985(3): The officers' coordinated efforts with a private party (Plaintiff's abuser), including providing legal advice, refusing to document abuse, and facilitating retaliatory custody actions, constitute a conspiracy to deprive Plaintiff of equal protection and due process rights. This claim is valid where, as here, there is (1) a conspiracy; (2) motivated by discriminatory or retaliatory animus; (3) to deprive a person of equal protection or privileges; and (4) an overt act in furtherance of the conspiracy. See *Griffin v. Breckenridge*, 403 U.S. 88 (1971); *Dennis v. Sparks*, 449 U.S. 24 (1980).

118.    Count III – Deprivation of Procedural and Substantive Due Process: The officers failed to investigate, obstructed Plaintiff's legal claims, and enabled her summary removal from her home and child without due process—depriving her of liberty and property interests without a hearing, without evidence, and without recourse. Their conduct is actionable under the Fourteenth Amendment. See *Zinermon v. Burch*, 494 U.S. 113 (1990); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000).

119.    Count V – Equal Protection: The officers treated Plaintiff, a woman seeking protection from male-perpetrated domestic violence, differently from similarly situated individuals, including by disbelieving her, refusing to act, and siding with her abuser.

43

Such selective enforcement and gender-based differential treatment violates the Equal Protection Clause. See *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990); *Hinchy v. Police Dep't of the City of New York*, 2020 WL 2836771 (E.D.N.Y. 2020).

120.    Count VI – Intentional Infliction of Emotional Distress: The officers' conduct—gaslighting a domestic violence victim, ignoring her safety concerns, and empowering her abuser to deprive her of home and child—was extreme, outrageous, and beyond all bounds of decency, especially given their sworn duty to protect. Their actions were intentional, malicious, and caused Plaintiff severe emotional and psychological harm. See *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315 (1976).

121.    Count VII – Abuse of Process: By aligning themselves with Plaintiff's abuser and manipulating official procedures—including rushing false petitions, enabling improper vacate orders, and obstructing Plaintiff's court access—the officers engaged in a willful misuse of legal process for an ulterior purpose. Abuse of process does not require an invalid filing; it requires using lawful process to achieve unlawful ends, precisely what occurred here. See *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396 (2002).

122.    Rebuttal to Potential Defenses:

- Qualified Immunity: As shown, the officers violated clearly established rights under the Fourteenth Amendment and M.G.L. c. 209A. Their conduct was not discretionary; it was retaliatory and conspiratorial, as detailed in *Hope v. Pelzer*, 536 U.S. 730 (2002).

- Good Faith or Lack of Malice: Evidence of deliberate refusal to document abuse,

44

private off-camera collaboration with the abuser, and systemic denial of Plaintiff's rights under Massachusetts policy standards all negate any presumption of good faith.

- Lack of Causation: The direct causal link between the officers' conduct and Plaintiff's injuries is well-pleaded and supported by a logical and fact-specific sequence of events—satisfying both proximate and legal cause under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Accordingly, Counts I, II, III, V, VI, and VII must proceed to discovery and trial. The complaint's factual allegations, taken as true, satisfy all federal pleading standards under Rule 8(a) and survive dismissal under Rule 12(b)(6).

**Defendant Brenda Liimatenan**

123. Defendant Brenda Liimatenan, a social worker employed by the Massachusetts Department of Children and Families (DCF), is sued in her individual capacity for actions taken under color of state law that violated Plaintiff's constitutional rights and materially contributed to the deprivation of her liberty, privacy, and parental integrity.

124. Liimatenan's involvement began when she appeared unannounced at Plaintiff's residence, initiating contact based solely on a referral made by Plaintiff's known abuser—a man with a history of coercive control, domestic violence, retaliatory conduct, and intimidation. Despite this context, Liimatenan treated the referral as presumptively credible, without performing any risk assessment regarding the source's credibility or possible retaliatory motive, as required under DCF policy guidelines and accepted trauma-informed protocols.

45

125. Her unannounced home visit (planned by Liimatenan and Plaintiff's abuser in secret prior)—conducted without prior notice, without exigent circumstances, and without judicial authorization—constituted an intrusion upon Plaintiff's private residence and family sanctity, in violation of Plaintiff's Fourth and Fourteenth Amendment rights, as well as Article 14 of the Massachusetts Declaration of Rights. The Supreme Court has repeatedly emphasized that government officials must not intrude upon the home without warrant, consent, or exigency. See *Camara v. Municipal Court*, 387 U.S. 523 (1967); *Stanley v. Illinois*, 405 U.S. 645 (1972).

126. During the visit, Liimatenan conducted an invasive search of Plaintiff's home and belongings, ostensibly to identify signs of alcohol abuse. Notably, she found no alcohol present, not even in trash or recycling bins—facts that were later corroborated by Plaintiff's self-initiated toxicology tests, both of which returned negative for alcohol or other substances. Despite these exculpatory results, Liimatenan proceeded to open a case against Plaintiff, treating her as presumptively guilty of child endangerment based solely on a malicious referral from her abuser, in violation of her obligations to investigate impartially and to protect victims of domestic abuse.

127. This conduct deviated sharply from DCF's own Protective Intake Policy and from trauma-informed practices required under both state regulations (110 CMR) and federal standards, including CAPTA (Child Abuse Prevention and Treatment Act) requirements regarding screening credibility of referrals.

128. Liimatenan's actions set in motion a sequence of legal and social consequences that were both foreseeable and catastrophic: the escalation of false narratives about Plaintiff's parental fitness, the erosion of her credibility in ongoing family court proceedings, and

46

the entrenchment of coercive control dynamics enabled by state power. Her decision to open a case despite the absence of credible evidence or immediate risk facilitated future violations by codefendants, including further state retaliation, procedural manipulation, and eventual temporary removal of Plaintiff's child.

129.    Accordingly, Liimatenan is liable under 42 U.S.C. § 1983 for violating Plaintiff's Fourth and Fourteenth Amendment rights, and for acting with deliberate indifference to the known risk of harm posed by relying on a coercive, bad-faith referral. Her conduct also supports claims under Count III (Due Process), Count IV (Retaliation), Count V (Equal Protection), Count VI (Emotional Distress), and Count VII (Abuse of Process).

130.    Despite the glaring conflict of interest in accepting an anonymous referral originating from Plaintiff's known domestic abuser—who was, at best, an interested party and at worst, a malicious actor seeking state intervention to consolidate control—Defendant Brenda Liimatenan proceeded to treat the referral as legitimate and urgent, without conducting a threshold assessment of its reliability, retaliatory motive, or potential for misuse of the DCF process.

131.    Even assuming arguendo that the abuser qualified as a "mandated reporter" (by calling multiple mandated reporters in attempt to hide his identity) under Massachusetts law, mandated status does not confer immunity for false or malicious reporting, nor does it absolve state agents of their independent constitutional obligations to screen for bias, credibility, and probable cause. See Nelson v. City of Davis, 685 F.3d 867, 877 (9th Cir. 2012) (officials must independently evaluate referrals for reliability and not accept them at face value where bias or malice is apparent).

132.    Despite this, Liimatenan conducted an unannounced home visit, entering Plaintiff's

private residence without judicial authorization, probable cause, or the presence of exigent circumstances, in violation of the Fourth Amendment to the U.S. Constitution and Article 14 of the Massachusetts Declaration of Rights. Such an intrusion into a constitutionally protected home—especially one conducted without consent, notice, or exigency—has been consistently found to violate long-established legal precedent. See *Camara v. Municipal Court*, 387 U.S. 523 (1967); *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999); *Sampson v. County of Los Angeles*, 974 F.3d 1012 (9th Cir. 2020).

133.    DCF social workers are not exempt from these constitutional limitations. In *Walsh v. Erie County Department of Job and Family Services*, 240 F. Supp. 2d 731 (N.D. Ohio 2003), the court held that a child protective services agent who entered a home without a warrant, consent, or exigent circumstances could be held liable under § 1983. Similarly, courts have found that even well-intentioned protective actions must adhere to basic due process and Fourth Amendment standards. See *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977); *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001).

134.    Liimatenan's failure to seek consent, obtain a court order, or establish probable cause before intruding into Plaintiff's home reflects a reckless disregard for constitutional protections, especially egregious given that Plaintiff was herself a victim of domestic abuse seeking protection. Instead of safeguarding her rights, Liimatenan acted as an extension of the abuser's coercive tactics, allowing the DCF system to be weaponized against a protective parent.

135.    This act of state-enabled domestic retaliation, under color of law, was not only procedurally deficient—it was constitutionally intolerable, violating Plaintiff's rights to privacy, familial integrity, and due process under § 1983, and laying the groundwork for

additional retaliation and injury at the hands of state actors.

136.    During the home visit, Defendant Brenda Liimatenan conducted a warrantless and unconstitutional search of Plaintiff's home under circumstances that were neither neutral nor lawful. The entry and search were facilitated not by Plaintiff's consent or court order, but by covert coordination between Liimatenan and Plaintiff's abuser, who opened the door and allowed the DCF agent access to the home without Plaintiff's knowledge or informed consent. Liimatenan and Plaintiff's abuser had been coordinating prior through messages and calls to ambush and gaslight Plaintiff.

137.    At the time, the abuser was engaged in a pattern of coercive control, retaliation, and legal manipulation, and was known to both Liimatenan and DCF as a source of the referral. Despite the obvious conflict of interest and statutory duty to safeguard victims of domestic violence, Liimatenan colluded with the abuser to initiate a child protection intervention against Plaintiff—treating the home as if Plaintiff were presumptively guilty without any neutral investigation or threshold screening for retaliatory motive.

138.    Once inside the home, Liimatenan proceeded to search Plaintiff's residence in its entirety, examining every room, trash bin, and personal space for evidence of alcohol, drug use, neglect, or unsafe living conditions. Plaintiff, fully aware of the retaliatory intent behind the referral, invited Liimatenan to perform a full walkthrough precisely to demonstrate the baselessness of the allegations. The results of the search were unequivocal: there was no alcohol present—not in use, in storage, or even in the trash or recycling. There were no drugs, no unsafe conditions, and no indicia of endangerment.

139.    Nevertheless, Liimatenan refused to document or credit these findings, and instead proceeded to open a DCF case against Plaintiff, relying solely on the false narrative

advanced by the abuser—without any physical corroboration, probable cause, or risk-based justification. This conduct not only violated Plaintiff's Fourth Amendment rights against unreasonable searches and seizures, but also violated Article 14 of the Massachusetts Declaration of Rights, which provides heightened protections for the sanctity of the home.

140.    In *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999), the court held that a child welfare agent who entered and searched a home without warrant or consent—despite having received a referral—was liable under § 1983 for constitutional violations. The court rejected the idea that social workers are exempt from Fourth Amendment constraints, holding instead that the home is constitutionally protected even in child welfare contexts.

141.    Likewise, under M.G.L. c. 119, § 51B, DCF workers must have reasonable cause, exigent circumstances, or judicial authorization before entering or searching a family's residence. No such lawful basis existed here.

142.    What made this intrusion particularly egregious was the underlying collaboration with the abuser, which converted a state protective agency into an instrument of abuse, amplifying the very dynamics DCF is charged with preventing. By aligning herself with a known abuser and ignoring objective exculpatory evidence uncovered during the search, Liimatenan abandoned any pretense of neutrality and acted in direct violation of her statutory and constitutional duties.

143.    This conduct supports multiple counts under this complaint, including Count I (Civil Rights), Count III (Due Process), Count IV (Retaliation), Count V (Equal Protection), Count VI (Intentional Infliction of Emotional Distress), and Count VII (Abuse of

Process).

144.    Liimatenan's actions were not merely flawed—they were instrumental in weaponizing state power against a victimized parent, and they caused substantial, enduring harm to Plaintiff's health, safety, parental standing, and civil dignity.

145.    In a proactive effort to disprove the baseless and retaliatory allegations made by her known abuser, Plaintiff voluntarily submitted to two separate alcohol screenings at certified, independent medical facilities. These tests were conducted shortly after the home visit and produced negative results, confirming the complete absence of alcohol or substance use.

146.    Plaintiff promptly provided documented proof of these results directly to Defendant Brenda Liimatenan. These test results—combined with the lack of any physical evidence of alcohol use in the home, the safe and orderly condition of the residence, and the known retaliatory source of the referral—should have resulted in immediate closure of any investigation under M.G.L. c. 119, § 51B, which requires a determination of "reasonable cause" based on credible evidence of abuse or neglect before proceeding with intervention. Instead, Liimatenan ignored the exculpatory medical evidence and unilaterally chose to open a DCF case against Plaintiff, thereby initiating a chain of escalating state interventions with no factual foundation or lawful justification.

147.    This decision reflected a presumption of guilt, not grounded in any verifiable evidence, but in personal bias and alignment with Plaintiff's abuser. By disregarding certified toxicology results, Liimatenan violated Plaintiff's procedural and substantive due process rights under the Fourteenth Amendment, and directly contravened her obligations under DCF's own operational guidelines, which mandate the use of objective data, non-

51

discriminatory investigation practices, and trauma-informed response when evaluating caregivers accused of substance use.

148. The intentional refusal to acknowledge Plaintiff's proactive compliance and medical evidence triggered a cascade of retaliatory agency actions, including repeated accusations of alcohol abuse, psychological degradation in family court proceedings, and the eventual disruption of Plaintiff's custodial rights. These agency actions were premised not on evidence, but on mischaracterizations that originated with Liimatenan's unjustified and unconstitutional decision to open a case in the face of contrary proof.

149. Federal courts have routinely held that state officials cannot ignore exculpatory evidence or fabricate the appearance of risk in child protection settings. In *Mabe v. San Bernardino County*, 237 F.3d 1101 (9th Cir. 2001), the court held that social workers violated due process by initiating proceedings without evidence of abuse and despite contrary information. Similarly, in *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999), the Second Circuit reaffirmed that the state may not remove or interfere with the parent-child relationship absent individualized suspicion and procedural due process.

150. Liimatenan's decision to disregard Plaintiff's medical evidence was not a mistake—it was a deliberate act of retaliation, taken in bad faith and under color of state law, to bolster an unfounded narrative advanced by a known abuser. This act materially contributed to Plaintiff's emotional trauma, reputational damage, parental alienation, and long-term destabilization.

151. Accordingly, this conduct supports liability under Count I (§ 1983 Civil Rights), Count III (Due Process), Count IV (Retaliation), Count V (Equal Protection), Count VI (Emotional Distress), and Count VII (Abuse of Process).

**Defendant Allyn Stacy**

152.    Defendant Allyn Stacy, a male social worker employed by the Massachusetts Department of Children and Families (DCF), is sued in his individual capacity for actions taken under color of state law that directly violated Plaintiff's constitutional rights and substantially contributed to her unlawful stigmatization, alienation from her child, and prolonged psychological and financial injury.

153.    After assuming responsibility for Plaintiff's DCF case, Stacy escalated an already tenuous and unsubstantiated investigation by advancing a narrative that Plaintiff was both alcohol dependent and mentally unstable, despite the complete absence of credible evidence to support such claims. In fact, Plaintiff had already provided multiple independent, certified alcohol tests, all of which were negative, and had demonstrated a history of lawful conduct, self advocacy, responsible parenting, and trauma-informed care—none of which reflected the dangerous behaviors typically required to justify state intervention under M.G.L. c. 119, § 51B.

154.    Rather than evaluating the case impartially or seeking corroboration, Stacy disregarded objective evidence and began constructing a record of unfitness based on fabricated concerns and subjective speculation, unmoored from clinical findings or professional assessments. He introduced allegations that Plaintiff was unstable and unwell, despite no diagnosis or basis in medical records, psychological reports, or collateral interviews. This conduct violated Plaintiff's Fourteenth Amendment rights to due process and equal protection, as well as her fundamental liberty interest in the care and custody of her child as protected by *Troxel v. Granville*, 530 U.S. 57 (2000).

155. Stacy's fabrication of allegations amounts to procedural and substantive misconduct. Under *Gottlieb v. County of Orange*, 84 F.3d 511 (2d Cir. 1996), child protective services workers may not rely on "unsubstantiated, anecdotal, or knowingly false evidence" to initiate or prolong state interventions. Courts have also held that DCF agents cannot distort or omit key facts to manufacture risk or parental unfitness. See *Elwell v. Byers*, 699 F.3d 1208 (10th Cir. 2012) (social workers are not entitled to qualified immunity when they misrepresent evidence in child custody proceedings).

156. By acting on fabricated allegations, without clinical substantiation or any objective corroboration, Stacy not only misused his authority under M.G.L. c. 119, but he also set in motion a chain of retaliatory and discriminatory conduct including blatant sexism and sexist remarks to Plaintiff, including further court-ordered monitoring, stigmatizing reports presented in custody proceedings, and manipulation of law enforcement perspectives against Plaintiff. His actions functionally disarmed Plaintiff in all future legal and administrative proceedings, rendering her without defense against coordinated state retaliation.

157. These fabrications also invaded Plaintiff's right to privacy, damaged her professional and personal reputation, and were central to the deprivation of her access to her child and to safe housing. Plaintiff's emotional distress and economic collapse were both reasonably foreseeable and directly caused by the false narratives propagated by Stacy.

158. Accordingly, Defendant Stacy's conduct supports liability under Count I (1983 Civil Rights), Count II (Conspiracy), Count III (Due Process), Count IV (Retaliation), Count V (Equal Protection), Count VI (Emotional Distress), Count VII (Abuse of

54

Process), and practicing medicine without a medical license.

159. Defendant Allyn Stacy, acting under color of state law and in his individual capacity as a DCF investigator, deliberately suppressed or destroyed exculpatory evidence that would have substantially rebutted the false narrative being advanced by Plaintiff's known abuser. This evidence included favorable toxicology reports, medical documentation of Plaintiff's wellness, and contextual submissions from Plaintiff highlighting the history of coercive control, domestic intimidation and violence, and false reporting being leveraged against her.

160. Despite receiving this material directly from Plaintiff, Stacy refused to include or reference these documents in DCF's internal case records, in violation of both constitutional due process under the Fourteenth Amendment and state agency requirements governing the collection and preservation of investigatory materials. See *M.G.L. c. 66A* (Massachusetts Fair Information Practices Act); *110 CMR § 4.00 et seq.* (DCF recordkeeping and confidentiality standards).

161. Stacy's omission and suppression of exculpatory evidence was not accidental or negligent—it was purposeful, retaliatory, and aligned with a larger campaign of disinformation initiated by Plaintiff's abuser. He routinely disregarded or discredited Plaintiff's disclosures of domestic violence and coercive control, despite the fact that even at the time, the concept of coercive control had been formally recognized by domestic violence advocates, trauma professionals, and law enforcement best practices. By intentionally ignoring these indicators, Stacy failed in his statutory and constitutional duty to assess family dynamics impartially and to protect children from manipulative misuse of state power.

162.   Instead, Stacy weaponized the DCF investigatory process to assist Plaintiff's abuser in securing retaliatory custody orders. His reports and communications mirrored the abuser's false claims, omitted mitigating evidence, and characterized Plaintiff as unstable, non-compliant, and unfit—despite the absence of any objective proof, clinical diagnosis, or third-party corroboration.

163.   This conduct constitutes not only a violation of 42 U.S.C. § 1983 but also violates clearly established federal law under *Brady v. Maryland*, 373 U.S. 83 (1963), as extended to civil proceedings involving state deprivation of rights. See *Tenenbaum v. Williams*, 193 F.3d 581, 604 (2d Cir. 1999) ("The state may not deprive a parent of the custody of her child without due process of law."); *Elwell v. Byers*, 699 F.3d 1208, 1213 (10th Cir. 2012) (social workers are not entitled to qualified immunity when they falsify or omit material information to the court).

164.   Stacy's conduct also directly contravenes 110 CMR 2.00–3.00, which requires DCF personnel to objectively record, preserve, and consider all materials submitted by families, including rebuttal evidence, medical records, and factual clarifications.

165.   His repeated alignment with the abuser, refusal to acknowledge manipulation indicators, and misuse of his official capacity to further a custody strategy for one party constitute a gross abuse of power, and proximately caused Plaintiff to be separated from her child, subjected to unlawful surveillance and stigma, and denied meaningful access to family court relief.

166.   Accordingly, Stacy's actions support claims under:

- Count I (Civil Rights, § 1983)
- Count II (Conspiracy)

- Count III (Due Process)

- Count IV (Retaliation)

- Count V (Equal Protection)

- Count VI (Intentional Infliction of Emotional Distress)

- Count VII (Abuse of Process)

167.    Defendant Allyn Stacy also collaborated with municipal law enforcement officers, including Officers Tim Budrewicz and Greg Bardwell, to manipulate official records and frame Plaintiff as mentally unstable, despite a lack of credible medical or psychological basis for such a label. This coordination between child protection services and police authorities occurred under color of state law, and functioned as a form of inter-agency retaliation—with the intent and effect of undermining Plaintiff's credibility, destabilizing her legal standing, and denying her access to meaningful redress through the court system.

168.    Stacy's involvement went beyond mere communication. He strategically shared biased, false, and incomplete information with law enforcement, reinforcing a narrative that Plaintiff was a danger to herself or others, despite overwhelming evidence to the contrary—including negative toxicology reports, the absence of any criminal behavior, and consistent compliance with court orders. This cross-agency character assassination weaponized the presumed credibility of state reports to deprive Plaintiff of fair treatment by police, courts, and social service systems.

169.    The coordinated effort with Officers Budrewicz and Bardwell resulted in:

- Dismissal or disregard of Plaintiff's subsequent 911 calls;

- Failure to investigate or arrest the abuser despite documented domestic violence;

57

- Minimization of Plaintiff's safety risks;

- Entrenchment of stigma in public records, influencing judicial officers and third-party service providers.

170.    This collusion fundamentally compromised the neutrality required in all public safety interactions and stripped Plaintiff of the presumption of integrity to which she was entitled under both federal and state law. See *United States v. Armstrong*, 517 U.S. 456 (1996) (selective enforcement claims are actionable when enforcement decisions are based on improper criteria); *DeShaney v. Winnebago County*, 489 U.S. 189 (1989) (state actors who create or enhance danger through affirmative conduct may be liable under the Due Process Clause).

171.    Further, Stacy's conduct violated Plaintiff's equal protection rights under the Fourteenth Amendment by subjecting her to disparate treatment based on a fabricated mental health narrative, one that was never supported by a licensed clinician and was transmitted for tactical advantage in custody litigation. Courts have recognized such collusion between child welfare agents and police to be actionable under 42 U.S.C. § 1983 when it results in the systematic deprivation of procedural fairness. See *Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000); *Gottlieb v. County of Orange*, 84 F.3d 511 (2d Cir. 1996).

172.    This coordinated targeting also violated Plaintiff's First Amendment rights to petition the government and to seek protective orders and legal remedies without fear of retaliation. See *Hayes v. Faulkner County*, 388 F.3d 669 (8th Cir. 2004) (retaliation by state actors for lawful conduct is actionable under § 1983).

173.    In sum, Defendant Stacy's collaboration with law enforcement—absent any legal

58

basis, individualized suspicion, or lawful authorization—functioned as a state-sponsored retaliatory campaign. It directly caused Plaintiff's exclusion from safety mechanisms, legal ostracization, and psychological distress, and therefore supports liability under:

- Count I (Civil Rights, § 1983)
- Count II (Conspiracy)
- Count III (Due Process)
- Count IV (Retaliation)
- Count V (Equal Protection)
- Count VI (Emotional Distress)
- Count VII (Abuse of Process)

174.    Faced with escalating hostility, biased reporting, and procedural manipulation by Defendant Allyn Stacy, Plaintiff formally and repeatedly requested the reassignment of her DCF caseworker, citing Stacy's clear alignment with her abuser, his disregard for medical and evidentiary submissions, and his retaliatory coordination with law enforcement. Plaintiff's concerns were articulated in writing and verbally to Defendant Rhonda Wornham, a supervisory official within the Massachusetts Department of Children and Families, who had clear statutory and managerial obligations to investigate such complaints under both M.G.L. c. 30A and DCF Policy 2016-001 (DCF Staff Conduct and Case Management Review).

175.    Rather than conducting any good-faith review or initiating appropriate internal oversight as required under DCF's grievance and supervision protocols, Wornham ignored Plaintiff's safety and procedural complaints entirely. More egregiously, Wornham responded to Plaintiff's protected request for a caseworker reassignment with

clear and immediate retaliatory measures—demonstrating a pattern of personal animus and institutional abuse of authority.

176.    Specifically, Wornham escalated the severity of internal DCF communications about Plaintiff, influencing court outcomes with one-sided and unverified declarations, despite her admitted lack of direct interaction with Plaintiff. Her retaliatory misconduct culminated in Wornham testifying in court under oath that, although she had had "little to no interaction" with Plaintiff, she had formed a negative impression sufficient to oppose Plaintiff's custody position. This facially arbitrary and capricious conduct violated Plaintiff's procedural due process rights under the Fourteenth Amendment, and substantively damaged Plaintiff's credibility and standing in subsequent hearings.

177.    Wornham's refusal to honor Plaintiff's reassignment request is not protected discretion—it constituted administrative retaliation, and she blocked the new worker from testifying in a court hearing and went on a tirade of smear campaign in direct retaliation, a gross violation of federal civil rights standards, and a breach of her duty of care to oversee neutral, non-discriminatory, and trauma-informed child welfare investigations. Her actions also contradict 110 CMR § 9.00, which obligates supervisors to address conflicts of interest and complaints of bias by subordinate employees.

178.    By dismissing a parent's legitimate complaints of institutional abuse—particularly in a context involving domestic violence, coercive control, and known retaliation—Wornham directly contributed to Plaintiff's:

- Ongoing psychological trauma;
- Loss of access to her daughter;
- Exclusion from fair legal process;

60

- Further institutional entrenchment of false narratives.

179.    Her conduct also violated Plaintiff's First Amendment right to petition government authorities for redress without fear of retaliation, and reflects a systemic failure in DCF's obligation to provide impartial oversight.

180.    Accordingly, Wornham's misconduct supports liability under:

- Count I (Civil Rights, § 1983)

- Count II (Conspiracy)

- Count III (Due Process)

- Count IV (Retaliation)

- Count V (Equal Protection)

- Count VI (Emotional Distress)

- Count VII (Abuse of Process)

**Defendant Rhonda Wornham**

181.    Defendant Rhonda Wornham, acting under color of state law and in her individual capacity as a supervisory official within the Massachusetts Department of Children and Families (DCF), took the extraordinary and improper step of personally appearing in family court to offer sworn testimony against Plaintiff, despite her own admission under oath that she had "little to no interaction" with Plaintiff.

182.    Wornham's testimony was factually baseless, emotionally charged, and procedurally improper. It was not grounded in direct observation, objective review, or clinical assessment. Instead, her statements mirrored the hostile narrative fabricated by subordinate DCF employee Allyn Stacy and Plaintiff's known abuser. By introducing

such testimony into a judicial proceeding, without first-hand knowledge or evidentiary support, Wornham engaged in conduct that violated Massachusetts evidentiary standards, as well as Plaintiff's constitutional right to a fair hearing.

183.    Under Massachusetts Guide to Evidence § 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Wornham's admission that she lacked such knowledge renders her testimony inadmissible and establishes that her participation served no legitimate fact-finding function.

184.    Instead, it had the improper purpose of influencing the court's perception of Plaintiff, thereby furthering retaliatory state actions.

185.    Moreover, DCF supervisory personnel have no statutory role as parties in family court custody proceedings, unless specifically subpoenaed for records or testimony under M.G.L. c. 119, § 21. Wornham's appearance was voluntary, unsolicited, and coordinated in service of a biased agenda. By taking the stand to speak negatively of Plaintiff—a mother asserting her rights and safety—without procedural basis, Wornham violated:

- Plaintiff's due process rights under the Fourteenth Amendment;

- DCF's own standards of neutrality and evidence-based case practice under 110 CMR § 1.07 and § 9.00;

- The duty of government actors to refrain from retaliatory conduct when an individual seeks redress in court, as protected by the First Amendment and enforced under 42 U.S.C. § 1983.

186.    Her behavior constitutes retaliation in its most direct form—not only punishing

Plaintiff for asserting grievances about departmental misconduct but using the machinery of the state to personally undermine a litigant's access to her child, liberty, and property interests. The testimony served to inflame judicial suspicion, distort court findings, and obstruct Plaintiff's right to meaningfully rebut false allegations.

187. Furthermore, Wornham's misuse of her authority to engage in extrajudicial commentary on matters outside her official role removes her from the protection of qualified immunity. See *Spencer v. Jackson County Mo.*, 738 F.3d 907 (8th Cir. 2013) (supervisors who personally engage in retaliation or defamatory conduct are not entitled to immunity for constitutional violations). Her participation in the hearing was not ministerial or advisory—it was adversarial, selective, and part of a coordinated campaign to punish Plaintiff for challenging institutional abuse.

188. The damage resulting from Wornham's testimony was profound: the family court relied on her statements to justify further invasive monitoring, extend custody limitations, and reinforce harmful narratives that had already deprived Plaintiff of safe housing and child access.

189. Accordingly, Wornham's conduct supports liability under:

- Count I (Civil Rights, § 1983)

- Count II (Conspiracy)

- Count III (Due Process)

- Count IV (Retaliation)

- Count V (Equal Protection)

- Count VI (Intentional Infliction of Emotional Distress)

- Count VII (Abuse of Process)

190.    Defendant Rhonda Wornham's improper testimony—despite her lack of direct involvement in Plaintiff's case—had immediate and unlawful consequences in family court proceedings. Following her factually unsupported and emotionally charged statements, Judge Kathleen Sandman relied on Wornham's testimony to impose punitive measures against Plaintiff, including:

- Sanctions on Plaintiff's procedural access;

- Escalation of custody restrictions limiting Plaintiff's contact with her child; and

- The continuation and expansion of coercive and medically unnecessary alcohol testing, all without new evidence or clinical justification.

191.    These judicial outcomes were not based on admissible evidence, objective findings, or due process hearings, but on Wornham's retaliatory narrative—delivered under oath, without personal knowledge, and outside the bounds of DCF policy or evidentiary reliability. This constituted a clear breach of procedural fairness and a denial of Plaintiff's right to be heard in a meaningful way. See *Goldberg v. Kelly*, 397 U.S. 254 (1970) (due process requires a full and fair hearing before the state can deprive someone of a protected interest).

192.    The coercive testing regimens that followed—including extended breathalyzer and urinalysis protocols—were unsupported by any individualized suspicion, contrary to existing medical reports, and in conflict with Judge Sandman's own prior acknowledgment that Plaintiff was not an alcoholic. These sanctions further violated Plaintiff's Fourth Amendment protections against unreasonable searches and seizures and constituted state-sponsored bodily intrusion without warrant or probable cause. See *Ferguson v. City of Charleston*, 532 U.S. 67 (2001); *Skinner v. Railway Labor*

64

*Executives' Ass'n*, 489 U.S. 602 (1989).

193.    Moreover, Wornham's testimony emboldened the court to view Plaintiff not as a parent advocating for her child and safety, but as a destabilizing figure, effectively branding her as noncompliant or disordered based solely on retaliatory state narratives. This unjustly shifted the burden of proof onto Plaintiff, contrary to principles of equal protection and judicial neutrality.

194.    The ripple effects were catastrophic: Plaintiff's relationship with her child was irreparably strained, her legal status in custody proceedings was undermined, and she was further stigmatized by state action based on false and procedurally tainted evidence. In total, Wornham's testimony served as the proximate cause of a series of unconstitutional deprivations, actionable under 42 U.S.C. § 1983 and § 1985(3), and formed part of a civil conspiracy with other state actors to retaliate against Plaintiff for exercising protected rights.

195.    Accordingly, this conduct further supports liability under:

- Count I (Civil Rights, § 1983)

- Count II (Conspiracy)

- Count III (Due Process)

- Count IV (Retaliation)

- Count V (Equal Protection)

- Count VI (Emotional Distress)

- Count VII (Abuse of Process)

196.    These actions—coordinated across multiple state actors and state-sponsored institutions violated Plaintiff's fundamental rights under the First, Fourth, and

65

Fourteenth Amendments to the United States Constitution, including the rights to familial integrity, freedom from retaliation for protected conduct, and procedural and substantive due process of law.

197.    First Amendment Violations – Retaliation and Access to Courts:  Plaintiff exercised her First Amendment right to petition the government for redress by:

- o   Reporting domestic violence through 911;
- o   Seeking a protective order under M.G.L. c. 209A;
- o   Filing complaints against state officials for misconduct;
- o   Presenting evidence and advocacy in custody litigation.

198.    In response, state actors—including but not limited to DCF officials, police officers, and judicial officers—retaliated against Plaintiff through:

- o   Institutional defamation;
- o   Escalation of testing and surveillance;
- o   Procedural roadblocks and exclusion from evidentiary hearings;
- o   Diminishment of her custodial rights based on false narratives.

Such retaliation for protected activity violates the First Amendment and is actionable under 42 U.S.C. § 1983. See *Hayes v. Faulkner County*, 388 F.3d 669 (8th Cir. 2004) (retaliation for filing grievance constitutes a First Amendment violation); *Hartman v. Moore*, 547 U.S. 250 (2006) (public officials may be held liable for retaliating against protected speech).

199.    Fourth Amendment Violations – Unreasonable Searches and Bodily Intrusion: Plaintiff was coerced and subjected to repeated, invasive chemical testing, including urinalysis and breathalyzer procedures, without probable cause, medical necessity, or judicial warrants. These intrusions:

o   Were not ordered through adversarial process;

o   Lacked individualized suspicion;

o   Were carried out under threat of custody sanctions;

o   Were based on fabricated or unverified allegations.

Such conduct constitutes unreasonable search and seizure, in violation of the Fourth Amendment. See *Ferguson v. City of Charleston*, 532 U.S. 67 (2001) (non-consensual drug testing for law enforcement purposes violates Fourth Amendment); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) (mandatory testing without probable cause is unconstitutional).

200.    Fourteenth Amendment Violations – Due Process and Familial Integrity: Plaintiff's procedural due process rights were repeatedly violated when:

o   She was denied the opportunity to present witnesses and evidence;

o   Adverse decisions were issued based on uncorroborated and retaliatory testimony;

o   Custody determinations were made without evidentiary hearings or lawful findings.

201.    These actions also deprived Plaintiff of substantive due process, including the constitutional right to familial association and parental integrity. The Supreme Court has long recognized that the right of parents to the care, custody, and companionship of their children is a fundamental liberty interest protected by the Fourteenth Amendment. See *Troxel v. Granville*, 530 U.S. 57 (2000); *Santosky v. Kramer*, 455 U.S. 745 (1982).

202.    The cumulative effect of these deprivations was to systematically dismantle Plaintiff's parent-child relationship, subject her to baseless surveillance and bodily intrusion, and punish her for lawfully asserting her rights against institutional abuse.

Such state action—when performed intentionally, conspiratorially, and in violation of clearly established law—supports liability under multiple constitutional provisions and precludes any qualified immunity defense.

203.    The DCF Defendants—Brenda Liimatenan, Allyn Stacy, and Rhonda Wornham— each acted in direct contravention of Massachusetts law and internal departmental mandates, violating both statutory protections and constitutional guarantees. Their conduct breached multiple layers of protection intended to shield families from arbitrary state intrusion and ensure fairness in child welfare proceedings.

204.    Violations of M.G.L. c. 119 and Statutory Custody Protections: Massachusetts General Laws Chapter 119 governs child welfare proceedings and explicitly conditions DCF intervention on substantiated risk, investigative integrity, and adherence to constitutional due process. Specifically:

- M.G.L. c. 119, § 51A prohibits unfounded or retaliatory reports and requires DCF to investigate only when reasonable cause exists to believe that a child is suffering from abuse or neglect.

- M.G.L. c. 119, § 51B mandates that investigations must be prompt, fair, and supported by evidence, and that decisions affecting custody or family integrity be fact based and transparent.

205.    The Defendants failed at every level:

- They acted on a referral originating from a known abuser, without evaluating credibility or conflict of interest.

- They initiated state involvement without probable cause, ignoring exculpatory evidence and verified negative alcohol test results.

- They escalated findings to support a retaliatory custody strategy coordinated with third-party actors, thereby weaponizing state authority against a fit parent.

206.   Violation of Internal DCF Policies and Fair Hearing Protocols: The Department of Children and Families is bound by its own regulations codified at 110 CMR, including:

- 110 CMR § 1.07: Requires impartiality in intake and case assignment;

- 110 CMR § 9.00 et seq.: Mandates procedural fairness and truthful representation in documentation and testimony;

- DCF Policy 2016-001: Directs supervisors and caseworkers to act with clinical objectivity, recognize trauma-informed contexts, and maintain neutrality in high-conflict custody disputes.

207.   By failing to act independently of Plaintiff's abuser, suppressing evidence, making biased recommendations, and testifying falsely in court, the DCF Defendants flagrantly violated these internal mandates. These were not administrative oversights but coordinated and retaliatory acts that irreparably harmed Plaintiff and her family.

208.   Failure to Satisfy the Reasonable Efforts Doctrine: Federal and state child welfare statutes—underpinned by Title IV-E of the Social Security Act (42 U.S.C. § 671(a)(15))—require that DCF make "reasonable efforts" to prevent the need for out-of-home placement and to preserve family unity. Massachusetts incorporates this standard explicitly in M.G.L. c. 119, § 29C, which obligates DCF to demonstrate that: "reasonable efforts have been made prior to placement to prevent removal and to make it possible for the child to return home."

209.   The Defendants made no reasonable efforts. They:

- Refused to reassign an identified hostile caseworker (Stacy);

- Escalated coercive control rather than mitigating it;

- Amplified conflict rather than facilitating reunification;

- Acted to alienate Plaintiff from her child, without judicial review, medical necessity, or factual basis.

210.    This systemic failure nullified Plaintiff's protected parental rights and directly contributed to her state-enabled trauma, separation from her child, reputational harm, and financial devastation.

211.    Accordingly, the actions of Liimatenan, Stacy, and Wornham are actionable under:

- 42 U.S.C. § 1983 (Civil Rights Deprivation);

- State constitutional protections under Article 10 of the Massachusetts Declaration of Rights;

- Tort-based claims for Emotional Distress and Abuse of Process;

-  Count II (Conspiracy) and Count III (Due Process) of this Complaint.

212.    The conduct of Defendants Liimatenan, Stacy, and Wornham was neither discretionary nor shielded by any lawful immunity doctrine. Their actions were retaliatory, fraudulent, and conspiratorial, executed with the intent to punish Plaintiff for exercising her rights, and to assist third-party actors in depriving her of protected liberties. Such behavior exceeds the scope of protected official functions and triggers personal liability under both federal and state law.

213.    Contrary to the protections afforded by qualified immunity or state sovereign immunity, public officials do not enjoy protection when their conduct is unlawful or

70

performed with malice or bad faith. Courts have made clear that immunity does not shield individuals who knowingly engage in rights-violating behavior:

- In Kalina v. Fletcher, 522 U.S. 118 (1997), the Supreme Court held that a prosecutor was not entitled to absolute immunity for filing a false affidavit, as that act was administrative and executed with intent to deceive, falling outside protected duties.

- In Lopez v. Dept. of Health Services, 939 F.2d 881 (9th Cir. 1991), the court denied immunity to child welfare officials who violated clearly established rights of parents through malicious or retaliatory actions, finding that "officials who act with deliberate indifference or retaliatory intent for constitutionally protected conduct are not immune from suit."

214.    Further, the Massachusetts Tort Claims Act (M.G.L. c. 258) and related common law doctrines do not protect state employees who act:

- Beyond the scope of their official duties;

- In bad faith, with malice, or with reckless disregard for the truth;

- In furtherance of an unlawful conspiracy to harm a private citizen.

215.    Defendants' joint participation in suppressing evidence, issuing false reports, influencing judicial proceedings without merit, and retaliating against Plaintiff for filing complaints and asserting rights constitutes conduct wholly outside the bounds of legitimate state function. Such actions were not authorized by statute, violated agency regulations, and directly contravened constitutional norms.

216.    Accordingly, Defendants are not entitled to immunity of any kind, and their personal liability under:

71

- 42 U.S.C. §§ 1983 and 1985(3);

  Massachusetts civil rights statutes;

- Common law tort doctrines; is properly before this Court and supported by binding precedent and well-established law.

217.    As a direct and foreseeable result of the unlawful acts described herein, Plaintiff has suffered profound and enduring injuries, both constitutionally and personally. These injuries include, but are not limited to:

- Extreme emotional distress, manifesting as complex post-traumatic stress disorder (CPTSD), anxiety, and debilitating psychological symptoms, stemming from ongoing surveillance, unjustified testing, and systematic state-sponsored retaliation;

- Loss of liberty, including bodily autonomy infringed by non-consensual and baseless chemical testing, restriction of access to her home, and denial of access to her child—absent judicial findings, individualized suspicion, or evidentiary hearings;

- Constitutional deprivations, including violations of Plaintiff's rights to: Free speech and petition (First Amendment), Freedom from unreasonable search and seizure (Fourth Amendment), Procedural and substantive due process (Fourteenth Amendment), and Familial integrity and equal protection (Fourteenth Amendment);

- Prolonged and unjustified family separation, orchestrated without statutory basis, contrary to judicial findings of parental fitness, and in contradiction to negative toxicology records, home inspection findings, and repeated exculpatory evidence.

218.   This systemic mistreatment has irreparably harmed Plaintiff's relationship with her child, causing months of interrupted bonding, emotional isolation, and reputational defamation that now impedes co-parenting efforts and community standing. Plaintiff has also suffered economic devastation as a result of lost housing, destroyed business opportunities, and legal expenses incurred to resist the unlawful state actions. These cascading harms were not incidental but were the intended consequence of a coordinated misuse of public power, deployed to silence, punish, and discredit Plaintiff for asserting her legal rights.

219.   Plaintiff continues to suffer ongoing harm and is entitled to compensatory damages, punitive damages, declaratory relief, and injunctive protection from further retaliation.

220.   These facts give rise to civil liability for Defendants Brenda Liimatenan, Allyn Stacy, and Rhonda Wornham, in their individual capacities, under a broad range of constitutional, statutory, and tort-based causes of action. Their conduct, jointly and severally, supports liability under the following counts:

221.   Count I – Civil Rights Violations (42 U.S.C. § 1983)

By acting under color of state law to deprive Plaintiff of her constitutional rights—including familial integrity, bodily autonomy, due process, and equal protection—each DCF Defendant is liable under § 1983. Their actions were neither lawful nor discretionary; they were retaliatory and conspiratorial, directly causing harm without legitimate state interest or judicial process. Count II – Conspiracy to Violate Civil Rights (42 U.S.C. § 1985(3))

222.   Defendants participated in a civil conspiracy with each other, with law enforcement,

73

and with private actors (notably, Plaintiff's abuser and his counsel) to:

- Discredit Plaintiff with false accusations;

- Suppress exculpatory evidence;

- Retaliate against her for protected conduct; and

- Influence court proceedings through coordinated false narratives.

Such conspiracies are actionable under § 1985(3), which prohibits collective deprivation of rights by two or more actors motivated by discriminatory animus or bad faith.

223.    Count III – Violations of Procedural and Substantive Due Process Each Defendant:

- Participated in decisions impacting Plaintiff's fundamental parental rights;

- Took action without fair notice, hearing, or impartial investigation;

- Imposed restrictions without lawful basis, in violation of M.G.L. c. 119 and federal due process protections.

These acts shocked the conscience and lacked even the minimal fairness required by the Fourteenth Amendment.

224.    Count IV – Retaliation for Protected Activity: Plaintiff was subjected to escalating state surveillance, public character assassination, and false reports after:

- Requesting a protective order;

- Filing grievances with DCF and other bodies;

- Asserting her legal rights in court.

- Retaliation for exercising constitutional rights—particularly access to courts and petition for redress—is prohibited under the First and Fourteenth Amendments and actionable under § 1983.

225.    Count V – Denial of Equal Protection:  Plaintiff was treated differently from similarly

74

situated parents based on impermissible factors, including:

a. Her gender;

b. Her status as a survivor of domestic violence;

c. Her pro se legal advocacy.

DCF Defendants intentionally chose to side with a known abuser and refused to enforce laws or policies designed to protect abuse victims, thereby creating a discriminatory double standard.

226.    Count VI – Intentional Infliction of Emotional Distress: The conduct of these Defendants—knowingly false reports, suppression of evidence, targeting Plaintiff for retaliation—was outrageous in character and extreme in degree, intended to cause and in fact causing Plaintiff severe emotional distress, warranting damages under Massachusetts tort law.

227.    Count VII – Abuse of Process: DCF Defendants willfully misused the investigatory and court referral processes for ulterior motives, including:

a. Influencing custody proceedings without factual basis; Escalating claims to preserve departmental control;

b. Retaliating against Plaintiff for whistleblowing or complaint.

This abuse of state process constitutes a textbook tort under Massachusetts law.

228.    Count VIII – Negligence and Supervisory Liability: Defendant Rhonda Wornham, as supervisor, failed to:

- Intervene despite clear evidence of bias and misconduct by Stacy and Liimatenan; Enforce internal policy or legal standards;

- Prevent foreseeable harm to Plaintiff.

This negligence in supervision and failure to train or correct subordinates gives rise to direct and vicarious liability under M.G.L. c. 258 and the federal supervisory liability doctrine in Redman v. County of San Diego, 942 F.2d 1435 (9th Cir. 1991)

## Defendant David Sharp

229.    Defendant David Sharp, an attorney licensed to practice in the Commonwealth of Massachusetts, is named herein in his individual capacity for actions taken under color of state law and in concert with government officials to unlawfully deprive Plaintiff of her constitutional and statutory rights. Sharp's conduct extended far beyond that of a traditional legal advocate and reflected a sustained pattern of retaliatory, coercive, and conspiratorial misconduct, undertaken in collaboration with officers of the court, Department of Children and Families agents, and law enforcement personnel.

230.    Sharp's coordination with state actors—particularly Judge Kathleen Sandman, Officers Tim Budrewicz and Greg Bardwell, and DCF workers—was not incidental but intentional and material to the deprivations suffered by Plaintiff. As early as the initiation of Plaintiff's family court proceedings, Sharp engaged in a series of extra-judicial acts that cannot be cloaked in immunity, litigation privilege, or attorney discretion, including:

- Dictating to the court extra-legal testing protocols without any lawful authority;
- Suppressing exculpatory evidence;
- Filing late-hour motions designed to prevent meaningful adversarial response;
- Making materially false representations of fact and science (e.g. "flushing" and creatinine interpretations) to influence judicial

76

decisions;

- Intentionally prolonging litigation to impose financial and psychological hardship;

- Engaging in personal confrontations with Plaintiff to intimidate and silence her.

231.    These acts constitute state action under 42 U.S.C. § 1983, as clarified in Dennis v. Sparks, 449 U.S. 24 (1980), where the U.S. Supreme Court held that private persons who conspire with state actors to violate constitutional rights act under color of state law and are not immune. Sharp operated not merely as private counsel, but as a quasi-judicial enforcer of punitive conditions, including court-unauthorized testing regimes and access limitations, operating de facto as a state agent.

232.    Sharp's participation in this scheme was not protected by the Massachusetts anti-SLAPP statute (M.G.L. c. 231, § 59H), because his actions were not "petitioning activity" as defined by law. The anti-SLAPP statute is inapplicable where:

- The defendant's conduct is not primarily based on petitioning but on unlawful behavior;

- The acts complained of are outside the scope of advocacy and instead constitute factual misrepresentation, abuse of process, or conspiracy;

- The harm flows not from the petitioning per se, but from underlying bad faith conduct. See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156 (1998) and Blanchard v. Steward Carney Hosp., Inc., 483 Mass. 200 (2019)

233.    Plaintiff's claims are not aimed at suppressing lawful litigation but at redressing unlawful and retaliatory acts performed under the pretense of advocacy, for which neither qualified immunity, anti-SLAPP protection, nor litigation privilege

apply. Sharp's behavior, individually and in coordination with others, triggered a cascade of unconstitutional outcomes that materially injured Plaintiff, warranting civil liability under:

- Count I (Civil Rights Violation, § 1983);

- Count II (Conspiracy, § 1985(3));

- Count III (Due Process);

- Count IV (Retaliation);

- Count VI (Emotional Distress);

- Count VII (Abuse of Process).

234.    Defendant David Sharp was retained by Plaintiff's abuser prior to the formal initiation of the family court case, and based on timing and case posture, likely before any Department of Children and Families (DCF) involvement. This preemptive legal engagement—before the triggering of any state process—strongly suggests that Sharp was not hired merely to defend, but to initiate an offensive legal campaign coordinated to isolate, discredit, and economically destabilize Plaintiff.

235.    The sequence and substance of events indicate that Sharp was acting as a central architect of a retaliatory litigation strategy, using the color of law to facilitate:

- Early contact with law enforcement and DCF agents;

- Development of a parallel narrative of Plaintiff as unstable or unfit;

- Advance planning for filing emergency custody and vacate orders within hours of Plaintiff's protective order request;

- Manipulation of jurisdictional channels to steer the case toward favorable courts or judges (i.e., forum and judge shopping).

236.     Such conduct is not ordinary legal advocacy. Instead, it reflects malicious abuse of state institutions as instruments of domestic retaliation—contrary to both public policy and constitutional guarantees. Sharp's early involvement enabled the abuser to weaponize the legal system before Plaintiff even had a chance to defend herself, rendering her procedurally ambushed and psychologically cornered.

237.     Plaintiff contends that Sharp's role was not only that of private counsel but of a coordinated proxy for broader coercive control, functioning as a bridge between private malice and public enforcement mechanisms. His pre-litigation involvement, timing of pleadings, and coordination with DCF and police officers are indicative of a broader civil conspiracy under 42 U.S.C. § 1985(3) and actionable misconduct under Count I (Civil Rights) and Count IV (Retaliation).

238.     From the very outset of his involvement, David Sharp engaged in a systematic pattern of misconduct that far exceeded the boundaries of lawful adversarial representation. His actions were not merely zealous advocacy but deliberate, repeated, and materially false representations to the court, designed to manufacture judicial prejudice against Plaintiff and to engineer an outcome unsupported by fact or law.

239.     Sharp knowingly and repeatedly misrepresented Plaintiff's medical data, particularly her creatinine levels, which he falsely characterized as evidence of "flushing"—a term used to imply deliberate overhydration to mask alcohol or drug use. This allegation, unsupported by any clinical findings or toxicology protocol, was in direct contradiction to:

- Plaintiff's actual medical records;

- Independent test results from certified facilities;
- Established scientific literature, which explains that elevated creatinine levels are associated with dehydration or certain medical conditions, not overhydration.

240.    Despite being fully aware that Plaintiff had passed multiple toxicology screens—both urinalysis and hair follicle tests—Sharp persisted in advancing this false theory in open court, not for probative value, but for the purpose of judicial manipulation. His repetition of this narrative served to:

- Reinforce stigmatizing stereotypes about addiction and motherhood;
- Influence Judge Sandman to maintain unlawful testing regimens;
- Justify further deprivation of parental rights;
- Defame Plaintiff's character, both procedurally and reputationally.

241.    These actions were intentional and strategic, aimed at biasing the court by exploiting pseudoscience and disinformation under the guise of legal argument. Sharp's conduct constituted fraud upon the court, a doctrine which permits sanction or liability where an officer of the court corrupts the legal process through willful deceit. See *Hazel-Atlas Glass Co. v. HartfordEmpire Co.*, 322 U.S. 238 (1944).

242.    Moreover, by introducing false medical conclusions without expert qualification, license, or basis in law or medicine, Sharp effectively practiced medicine without a license, further violating Plaintiff's rights to due process and bodily autonomy under the Fourth and Fourteenth Amendments, and implicating 42 U.S.C. § 1983, M.G.L. c. 112 § 8, and common law torts such as negligent misrepresentation, intentional infliction of emotional distress, and abuse of process.

243.    This sustained misconduct demands legal accountability and supports Plaintiff's claims under Count I (Civil Rights), Count III (Due Process), Count IV (Retaliation), Count VI (Emotional Distress), and Count VII (Abuse of Process).

244.    Plaintiff further alleges that as a direct consequence of Attorney Sharp's repeated false representations to the court regarding her medical data, she experienced escalating fear, confusion, and physiological harm. Sharp told the court—without medical credentials, without expert testimony, and contrary to standard toxicology science—that Plaintiff's allegedly "elevated creatinine levels" signified "flushing," meaning intentional overhydration to conceal alcohol use. Plaintiff asserts that this representation was scientifically inaccurate, because in toxicology and nephrology, high creatinine levels are commonly associated with dehydration, impaired renal function, or benign physiological variance—not overhydration.

245.    By advancing this scientifically incorrect claim as if it were authoritative, Sharp created a false, stigmatizing narrative that Plaintiff was intentionally manipulating test results. Plaintiff alleges that Sharp's statements were made knowingly or with reckless disregard for the truth, for the purpose of:

- Inducing judicial suspicion,
- Prolonging punitive testing requirements,
- Undermining Plaintiff's credibility,
- And steering the litigation toward a predetermined adverse outcome.

246.    As Plaintiff alleges, the psychological impact of these false assertions was severe. Believing she was being scrutinized for "flushing" whenever her creatinine levels deviated from normal ranges, Plaintiff became terrified that any hydration pattern—even

routine—would be misinterpreted as evidence of substance abuse. In response to this climate of coercion,

247.    Plaintiff began significantly restricting her water intake in an effort to avoid any fluctuation that could be portrayed as deceitful.

248.    Plaintiff alleges that this hypervigilant dehydration, carried out under the weight of Sharp's repeated accusations and the court's acceptance of those accusations, caused:

- Kidney stress and physical harm,

- Symptoms associated with acute dehydration,

- Exacerbation of trauma-related anxiety,

- And deterioration of her overall physical health.

249.    Plaintiff contends that such harm was a reasonably foreseeable consequence of Sharp's intentional distortion of medical information, particularly given that he:

- Repeated the "flushing" accusation numerous times,

- Presented it as though it were medically authoritative,

- Used it to justify invasive bodily testing,

- And leveraged it to amplify judicial control measures over Plaintiff.

250.    Federal courts have held that deliberately false representations made by officers of the court that result in bodily harm, emotional suffering, or unconstitutional coercion are actionable under § 1983 and common-law tort doctrines. See, e.g., *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) (fraud upon the court); *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (fabrication of evidence causing constitutional injury).

251.    Thus, Plaintiff asserts that Sharp's conduct directly contributed to:

- Violations of her Fourth Amendment right to be free from unreasonable bodily intrusions;

- Violations of her Fourteenth Amendment right to bodily integrity and substantive due process;

- Severe emotional distress;

- And physical injury linked to the coercive environment he helped create.

252.    Accordingly, Plaintiff alleges that this conduct supports liability under Count I (Civil Rights), Count III (Due Process), Count IV (Retaliation), Count VI (Emotional Distress), and Count VII (Abuse of Process).

253.    Plaintiff further alleges that Attorney David Sharp engaged in persistent out-of-court confrontations intended to harass, intimidate, and destabilize her emotionally and psychologically. These encounters occurred in hallways adjacent to the courtroom, in small waiting or conference rooms, and in other semi-private spaces within courthouses and court-related facilities, where Plaintiff was often unrepresented and alone, and where Sharp abused his authority and professional role to assert dominance and induce fear

254.    During these encounters, Sharp spoke directly to Plaintiff in a hostile and patronizing tone, despite her being a self-represented litigant in an adversarial proceeding. He made demeaning remarks, minimized her legal position, dismissed her personal safety concerns, and at times mocked her emotional state. Plaintiff asserts that these interactions were witnessed by third parties—including court staff, law enforcement, and other litigants—and that such confrontations were designed not to resolve legal matters, but to coerce her into silence, submission, or withdrawal from the litigation process.

255.    This behavior constitutes not only a breach of professional ethics and courtroom decorum but an intentional act of extrajudicial coercion, taken outside the bounds of any advocacy role. Sharp's statements and demeanor were not protected legal communication, but instead constituted a pattern of personal harassment and psychological abuse, designed to:

- Exploit Plaintiff's vulnerable status as a pro se litigant and abuse victim;
- Escalate the emotional and mental toll of litigation;
- Discourage Plaintiff from pursuing her legal rights;
- Impair Plaintiff's capacity to advocate effectively on her own behalf.

256.    Plaintiff alleges that this conduct was part of a coordinated pattern of retaliatory litigation abuse, undertaken not only in the courtroom but in the physical spaces surrounding it, where legal protections are presumed to extend, but are often unenforced, including emails and court Zoom waiting rooms. These confrontations were not incidental; they reflected an ongoing strategy to suppress Plaintiff's legal voice, weaponize proximity and authority, and achieve unlawful advantage through intimidation, rather than lawful procedure.

257.    Such conduct, even by a private attorney, may give rise to liability under 42 U.S.C. § 1983 and § 1985(3) when done in concert with state actors and in furtherance of an unlawful conspiracy to violate civil rights. See *Dennis v. Sparks*, 449 U.S. 24 (1980). Additionally, this conduct supports claims for:

- Intentional Infliction of Emotional Distress, where conduct is extreme, outrageous, and intended to cause harm;
- Abuse of Process, where litigation-related interactions are weaponized

- for extrajudicial purposes;

- Retaliation for Protected Activity, including Plaintiff's attempts to petition the court and defend her custodial rights.

258. These off-record confrontations materially contributed to Plaintiff's trauma, legal disadvantage, and sense of being trapped within a judicially sanctioned coercive environment. As such, they form part of the factual basis for Counts I, II, IV, VI, and VII of this Complaint.

259. Plaintiff alleges that Defendant David Sharp engaged in a relentless campaign of character assassination, repeatedly labeling her as "an alcoholic" or "alcohol dependent" or "self-medicating with alcohol" or "alcohol addict" in written pleadings, oral arguments, and courtroom interactions, and emails to Plaintiff and others, despite the complete absence of evidentiary support and contrary to findings made by the presiding judge early in the proceedings. These statements were not incidental or isolated; rather,

260. Plaintiff has identified over 80 distinct instances in which Sharp either referred to her directly as "an alcoholic" or strongly implied alcohol dependence in a manner intended to influence judicial outcomes and third-party perceptions.

261. At the time Sharp made these statements—and throughout the entirety of the relevant litigation period—Plaintiff had submitted to repeated, court-ordered and voluntary toxicological screenings, including:

- SCRAM breathalyzer,

- Random urinalysis,

- Hair follicle testing,

- Voluntary third-party laboratory evaluations, and

- SoberLink screens once the court could not longer continue his demands, which Plaintiff agreed as she would bear no costs; but is now facing further SoberLink abuse and for Plaintiff to bear costs going forward despite clean screens – it is a campaign of abuse and psychological warfare to discredit Plaintiff, create bias and prejudice, financial abuse, and subject her to forced regular contact with her abuser.

262.    Results were and continue to be consistently negative for alcohol and other substances, and Plaintiff's treating providers offered no medical indication of a substance use disorder.

263.    Within the first month of proceedings, the presiding judge acknowledged on the record that Plaintiff was not an alcoholic and directed that the case proceed without further stigma or unsupported allegations. Nevertheless, Sharp persisted in propagating this false narrative, invoking the accusation in support of punitive custody restrictions, escalated testing regimens, vacate orders, and denial of basic parental rights.

264.    These repeated mischaracterizations served no legitimate legal function and were not tied to any bona fide evidentiary showing. Instead, Plaintiff alleges that Sharp used the label of "alcoholic" and similar terms as a tactical smear—an act of defamation intended to poison the court's perception of Plaintiff, inflame public suspicion, and coerce Plaintiff into compliance through humiliation and reputational ruin.
Such statements were made:

- To erase Plaintiff as a parent with zero grounds in a clear personal agenda of abuse by Sharp;

- With actual malice, as defined under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964);

- With reckless disregard for truth, satisfying the standard for punitive damages under state and federal tort law;

- And in a manner that exceeded the bounds of any protected litigation privilege, given their frequency, falsity, and detachment from any genuine legal dispute.

265. Moreover, Sharp's false accusations intentionally inflicted emotional distress, causing Plaintiff to experience:

- Panic attacks,

- Loss of sleep and appetite,

- Fear of false institutional reporting,

- Reputational injury within her community,

- And fear that her child would be permanently taken based on lies.

266. The Massachusetts tort of intentional infliction of emotional distress requires that conduct be extreme and outrageous, beyond all possible bounds of decency. See *Agis v. Howard Johnson Co.*, 371 Mass. 140 (1976). Sharp's sustained defamation campaign, infused with stigma, legal weaponization, and emotional cruelty, satisfies this standard, especially with recent out of court demands by Sharp for Plaintiff to "comply" to a PeTH test (and invasive blood test) and full access to HIPAA protected information.

267. These acts support Count I (1983 Civil Rights), Count II (Conspiracy), Count IV (Retaliation), Count VI (Intentional Infliction of Emotional Distress), and Count VII (Abuse of Process). They also present a viable cause of action under Massachusetts

common law for defamation per se, as the statements falsely accused Plaintiff of a medical disorder and parental unfitness.

268.   Plaintiff alleges that Defendant David Sharp, acting in collusion with Judge Kathleen Sandman, engaged in a systematic abuse of procedural mechanisms—namely emergency motions—for the purpose of denying Plaintiff a meaningful opportunity to be heard. Specifically, Sharp routinely filed "emergency" and/or "deadlined" motions late in the court day, often just before close of business or just prior to scheduled hearings, thereby ensuring that Plaintiff—appearing pro se—had insufficient time to review, research, or respond. These filings were not predicated on genuine exigencies. Instead, they consistently sought:

- Increased testing,

- Tightening of restrictions on parenting time,

- Immediate judicial rulings without hearing, and

- Unilateral imposition of conditions outside procedural norms.

269.   Sharp's repeated invocation of the "emergency" label enabled him to circumvent ordinary motion timelines and service requirements, triggering expedited judicial attention without adversarial balance. On multiple occasions, Plaintiff alleges that Judge Sandman entertained these motions ex parte or with minimal notice, issued rulings sua sponte, and declined to grant Plaintiff extensions of time even when sought in good faith.

270.   This practice violated:

- Massachusetts Rules of Domestic Procedure, Rule 5, requiring proper service and opportunity to respond;

- Local standing orders on emergency motion practice, which caution against misuse;

- And Plaintiff's fundamental right to notice and opportunity to be heard, protected under the Fourteenth Amendment's Due Process Clause and Article 10 of the Massachusetts Declaration of Rights.

271.   Plaintiff alleges that this pattern of behavior:

- Created a litigation trap, where Plaintiff was repeatedly forced to respond to surprise allegations with no time or legal support;

- Destabilized the fairness of the proceedings, tilting judicial outcomes through manufactured urgency;

- And caused irreparable prejudice, including repeated loss of parenting time, expansion of surveillance protocols, and psychological stress.

272.   Sharp's coordination with Judge Sandman in this regard was not merely adversarial zeal but part of a concerted strategy to engineer disadvantage through procedural ambush, in violation of Plaintiff's civil rights and contrary to established principles of adversarial justice. As such, Sharp's actions support liability under:

- 42 U.S.C. § 1983 (civil rights deprivation);

- Count II (Conspiracy);

- Count III (Due Process);

- Count IV (Retaliation);

- Count VI (Emotional Distress); and

- Count VII (Abuse of Process).

273.   Federal courts have recognized that abuse of emergency motion practice to suppress one party's procedural rights may form a basis for constitutional injury,

89

especially when it occurs in concert with judicial actors. See *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994); *Shell v. Wall*, 940 F.2d 295 (8th Cir. 1991) (use of procedural manipulation to deprive constitutional rights actionable under § 1983).

274.   Plaintiff alleges that Attorney David Sharp systematically engaged in "judge shopping", a practice whereby litigants or attorneys attempt to direct cases toward specific judges perceived as favorable, thereby undermining the principle of judicial impartiality. In this matter, Sharp demonstrated repeated and conspicuous favoritism toward Judge Kathleen Sandman, whom he treated not merely as a neutral adjudicator, but as a strategic partner in his adversarial campaign against Plaintiff.

275.   This favoritism was evident in numerous ways, including:

- Sharp's repeated filings in venues under Judge Sandman's jurisdiction even when alternative forums were available;

- Strategic withdrawal and refiling of motions to time hearings with Sandman's availability;

- Sharp's pattern of tailoring pleadings to exploit Judge Sandman's known biases or prior rulings; and

- Procedural maneuvering to consolidate disputes before Judge Sandman, bypassing random judicial assignment protocols or reassignment processes.

- Attorney Sharp and Judge Sandman often spoke in the court hearings as if Plaintiff was not even in the room and negotiated without acknowledging Plaintiff's presence.

276.   Such conduct constitutes a violation of core ethical standards under the Massachusetts Rules of Professional Conduct, particularly:

90

- Rule 8.4(d), which prohibits conduct prejudicial to the administration of justice;

- Rule 3.3(a)(1), concerning candor to the tribunal;

- And Canon 2 of the Massachusetts Code of Judicial Conduct, which underscores the necessity of impartiality in judicial proceedings.

277. By attempting to game the judicial assignment system, Sharp subverted procedural fairness, exploited personal familiarity with a specific judge, and deprived Plaintiff of her right to a neutral arbiter. Courts have universally condemned judge shopping as "anathema to the rule of law," recognizing it as a form of procedural manipulation that erodes public confidence and violates due process. See *United States v. Johnson*, 247 F.3d 1032 (9th Cir. 2001); *In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003).

278. The repetitive nature of Sharp's efforts to keep the case before Judge Sandman, combined with his coordination on emergency motion tactics and narrative construction (as previously alleged), gives rise to a strong inference of collusive conduct. It suggests a dual pronged strategy: not merely to win legal arguments, but to curate a judicial environment hostile to Plaintiff, where adverse rulings could be reliably manufactured through known channels of deference or bias.

279. This conduct materially impacted:

- The impartiality of proceedings;

- The scope of judicial scrutiny applied to Plaintiff's evidence;

- And the overall trajectory of the litigation, including custody outcomes, financial penalties, and procedural rulings.

280. Accordingly, Sharp's judge shopping and manipulation of judicial assignments support liability under:

- Count I (42 U.S.C. § 1983), when performed in concert with state actors;

- Count II (Conspiracy), for coordinated deprivation of rights;

- Count III (Due Process), for denial of a neutral tribunal;

- Count IV (Retaliation), for acts taken to suppress Plaintiff's protected activities;

- Count VI (Emotional Distress), due to foreseeable harm;

- Count VII (Abuse of Process), for misuse of the court system.

281.    Throughout the course of the family court proceedings, Defendant David Sharp engaged in the suppression and obstruction of material exculpatory evidence, which directly undermined Plaintiff's ability to defend herself, protect her parental rights, and rebut defamatory allegations. These actions went far beyond vigorous advocacy and entered the realm of evidence tampering, procedural sabotage, and due process deprivation.

282.    Specifically, Sharp intentionally:

- Obstructed justice by withholding evidence he sent to the GAL, and continues to withhold to this day.

- Withheld or refused to acknowledge certified toxicology reports submitted by Plaintiff showing repeated negative results over several months;

- Disregarded mental health evaluations and parenting assessments that found no evidence of instability or neglect;

- Opposed or obstructed the admission of third-party witness statements and affidavits supporting Plaintiff's credibility, sobriety, and parental fitness;

92

- Deliberately mischaracterized or omitted material portions of filings and reports from third parties, skewing the evidentiary record to support false claims;

- And pressured the court—often successfully—not to admit rebuttal materials submitted by Plaintiff, effectively silencing her defense and distorting the factual landscape.

283.   This pattern of suppression and distortion served a dual function: to create a false evidentiary record that cast Plaintiff in a negative light, and to prevent judicial access to the truth. Such conduct is not protected by litigation privilege when it constitutes fraud upon the court, violates court orders, or is done in bad faith. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir. 1989).

284.   Moreover, when evidence critical to constitutional claims—such as parenting fitness, health, or legal compliance—is deliberately suppressed, it constitutes a violation of due process under the Fourteenth Amendment. See *Brady v. Maryland*, 373 U.S. 83 (1963) (though originally criminal in scope, Brady principles have been extended in certain civil rights contexts where the state or its agents conspire to suppress material exculpatory evidence).

285.   Plaintiff's attempts to introduce rebuttal evidence were routinely met with procedural obstruction, including:

- Objections based on alleged timing defects;

- Motions to strike Plaintiff's pro se filings;

- And tactical misrepresentations to the judge regarding the relevance or admissibility of documents.

93

286.    Sharp's actions materially contributed to the court's repeated punitive orders against Plaintiff, including:

- Ongoing involuntary drug testing;

- Restricted parenting time;

- Denial of evidentiary hearings;

- And a general judicial narrative premised on misrepresentations and omissions.

287.    These actions directly support causes of action under:

- Count I (1983 Civil Rights) – for deprivations under color of law;

- Count II (Conspiracy) – for collusion with state actors to achieve unlawful outcomes;

- Count III (Due Process) – for suppression of key evidence and obstruction of rebuttal;

- Count IV (Retaliation) – for punishing Plaintiff's exercise of protected speech and litigation rights;

- Count VI (Emotional Distress) – for foreseeably injurious conduct;

- Count VII (Abuse of Process) – for perverting the evidentiary process to secure improper advantage.

288.    Additionally, this conduct may constitute fraud upon the court, a doctrine that allows federal courts to vacate judgments obtained through intentional deception or misconduct by officers of the court. Sharp's deliberate effort to shape the record through suppression and distortion—particularly in coordination with judicial officers—meets the standard for such an exceptional remedy.

289.    Defendant David Sharp has exploited the family court litigation not as a means to

94

resolve genuine legal disputes, but as a prolonged and calculated vehicle for personal financial gain. From the outset, Sharp demonstrated a pattern of conduct intended to prolong proceedings, manufacture conflict, and extract fees from a protracted adversarial process, to the detriment of both Plaintiff and her legal adversary, who also became ensnared in the litigation Sharp orchestrated.

290. Rather than streamlining issues, identifying mutually agreeable settlements, or abiding by judicial economy principles, Sharp employed a deliberate strategy of:

- Repetitive and duplicative filings, including emergency motions with no new factual basis;

- Ex parte communications and last-minute procedural ambushes, requiring additional responses, appearances, and continuances;

- Unnecessary discovery demands and motion hearings, many of which were later dropped or mooted by intervening events;

- Strategic creation of conflict, including personal attacks and defamation intended to provoke emotional reactions and hinder resolution;

- And opposition to any cost-saving alternatives, such as mediation, stipulated agreements, or narrowing of contested issues.

291. This conduct reflects a pattern of bad faith litigation, aimed not at legal vindication but at economic attrition—forcing Plaintiff to expend resources and time in defending against frivolous or exaggerated claims and creating a continual state of litigation emergency. Such behavior is recognized under Massachusetts and federal law as constituting abuse of process, and may support claims for fraud and unfair practices, particularly where the conduct:

- Serves no legitimate legal purpose;

- Is intended to coerce a party into capitulation unrelated to the legal merits; or

- Results in unjust enrichment of the perpetrating attorney.

292. Massachusetts courts have repeatedly held that attorneys may not weaponize the legal system for self-serving or retaliatory ends. See *Judson v. Essex Agricultural and Technical Inst.*, 418 Mass. 159 (1994) (abuse of legal process actionable where no legitimate purpose exists); *Broadley v. State of Rhode Island*, 939 F.2d 994 (1st Cir. 1991) (abuse of litigation tactics may support § 1983 claim when undertaken in concert with state actors).

293. Sharp's billing and procedural record, as documented throughout the family court case, reflects:

- An intentional inflation of workload through needless motions and arguments;

- Delay tactics calculated to reset timelines and preempt final disposition;

- And resistance to any proposed efficiencies, such as stipulated custody plans or narrowing of issues for trial.

294. Moreover, Plaintiff alleges on information and belief that Sharp coordinated his litigation strategy with other state actors, including DCF employees and the presiding judge, to ensure continued jurisdiction and leverage, thereby creating a closed system of legal exploitation from which he derived financial benefit.

295. These actions support liability under:

- Count I (1983 Civil Rights) – when performed in coordination with state actors to prolong deprivation of rights;

- Count II (Conspiracy) – for the coordinated perpetuation of harm

through litigation;

- Count IV (Retaliation) – for using legal tools to punish Plaintiff's protected court access;

- Count VI (Intentional Infliction of Emotional Distress) – due to foreseeable and repeated harm from adversarial exploitation;

- Count VII (Abuse of Process) – for using judicial proceedings to extract fees and perpetuate hardship.

296.   Additionally, Plaintiff asserts that Sharp's exploitative litigation strategy contravenes public policy, violates the ethical duties imposed by the Massachusetts Rules of Professional Conduct, and undermines the core principles of the adversarial process. His conduct demands accountability not only for the financial harm inflicted but for the systemic abuse of the court's authority and the erosion of justice for financially vulnerable litigants.

297.   Defendant David Sharp has continued his pattern of retaliatory litigation and economic coercion by actively seeking to divert 100% of the Plaintiff's rightful share of proceeds from the sale of her home—a home previously held in trust by both Plaintiff and her abuser and in which she maintained equal equitable interest.

298.   Despite Plaintiff's documented financial contributions, shared ownership status through the Olcoz-Lawson Trust, and clear legal entitlement to a 50% distribution under equitable partition principles, Sharp now seeks to seize the entire escrow balance in favor of Plaintiff's abuser. He advances this position:

- Without presenting any lawful accounting, partition order, or trust dissolution framework;

97

- Without judicial findings of forfeiture, waste, or offset—all of which would require evidentiary hearings and findings not present in the record; In direct conflict with Massachusetts trust and property law, which requires proportional equity distribution absent contractual deviation;

- And without regard to Plaintiff's well-documented history of financial contribution and loss related to the property.

299. This legal maneuver is not based on fiduciary law, domestic relations precedent, or property doctrine—it is a continuation of Sharp's broader strategy of attrition, where Plaintiff is systemically deprived of shelter, custody, dignity, and now, economic restoration. It constitutes a clear effort to weaponize property litigation as a form of financial punishment, designed to leave Plaintiff destitute and unable to recover from the multi-year campaign of state-enabled abuse.

300. Massachusetts law recognizes that intentional interference with property interests, particularly where done for retaliatory or discriminatory purposes, supports causes of action under both state and federal law. See:

- *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262 (10th Cir. 1989) (denial of housing or property access as a constitutional harm);

- *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) (right to be free from unlawful government-influenced property seizure);

- *Kelo v. City of New London*, 545 U.S. 469 (2005) (requiring public justification for government-related takings).

301. Sharp's actions implicate not just ethical misconduct and procedural abuse, but also violations of Plaintiff's Fourteenth Amendment property rights, as the deprivation is

being pursued under color of law, in coordination with public officials, and in retaliation for Plaintiff's lawful conduct (e.g., petitioning the court for relief, pursuing custody, and reporting abuse).

302.    The attempted seizure of Plaintiff's home equity:

- Deprives her of necessary resources for housing, legal defense, and recovery;

- Constitutes a continuation of her coerced homelessness, initially enabled by earlier vacate orders and ignored 911 calls;

- And cements her exclusion from financial restitution, despite the disproportionate damage she has endured throughout this ordeal.

303.    As such, Sharp's conduct supports additional liability under

- Count I (§ 1983 Civil Rights) – for property deprivation under color of law;

- Count II (Conspiracy) – for coordinated economic abuse with state actors;

- Count III (Due Process) – for attempt to seize property without hearing, notice, or lawful procedure;

- Count IV (Retaliation) – for using property deprivation to punish Plaintiff for exercising constitutional rights;

    Count VI (Emotional Distress) – for foreseeable trauma caused by economic disempowerment;

- Count VII (Abuse of Process) – for perverting partition and escrow law for punitive ends;

- And potential common law torts, including conversion, unjust enrichment, and fraud.

304.    Defendant David Sharp's conduct was not that of a neutral advocate operating

within the bounds of adversarial litigation. Rather, his actions were performed in concert with state actors—including Judge Kathleen Sandman, Officers Budrewicz and Bardwell, and DCF agents Stacy, Liimatenan, and Wornham—as part of a calculated civil conspiracy to deprive Plaintiff of her federally protected rights. This conspiracy was executed through a coordinated campaign of procedural obstruction, retaliatory litigation, character assassination, evidentiary suppression, and economic sabotage, with the shared goal of isolating and discrediting Plaintiff while protecting her abuser.

305.    A critical and telling example of Sharp's bad faith and extrajudicial behavior involves his repeated refusal to provide Plaintiff with copies of materials he submitted to the court appointed Guardian ad Litem (GAL). Despite Plaintiff's direct requests and her lawful right to review and respond to materials influencing GAL findings—which have substantial impact on custody and liberty interests—Sharp has continued to obstruct justice by withholding this information. This refusal directly undermines Plaintiff's right to procedural fairness and her ability to rebut potentially false or defamatory claims communicated to the GAL ex parte and outside the scrutiny of the court.

306.    Furthermore, the videos in the evidence he refuses to give Plaintiff contain recordings without Plaintiff's consent and also show Plaintiff allegedly being poisoned and her daughter forced to watch her possibly die while her abuser recorded.

307.    This withholding of evidence violates due process under the Fourteenth Amendment and further supports a claim of intentional deprivation of access to the courts under *Christopher v. Harbury*, 536 U.S. 403 (2002). It also likely violates Massachusetts probate and family court procedures regarding transparency in GAL investigations and discovery, especially where the GAL report substantially influences custody

outcomes.

308.    Sharp's refusal to disclose these materials:

- Prevents Plaintiff from seeking criminal charges against her abuser by suppressing and hiding evidence of possible poisoning;

- Prevents Plaintiff from challenging falsehoods and correcting the record;

- Impairs her ability to litigate the best interests of the child;

- And shows deliberate intent to manipulate court outcomes through concealment and bad faith tactics.

309.    Additionally, Sharp's consistent use of language and tactics more appropriate for a law enforcement agent, prosecutor, or judge—rather than an attorney—further reflects that he stepped outside the protected role of advocate and assumed quasi-state authority in litigation. As such, he is not entitled to immunity, particularly where he acted:

- Outside the scope of normal legal representation; In collaboration with actual state officials;

- And in furtherance of a private and retaliatory campaign.

310.    Case law is clear: private individuals who conspire with state officials to violate constitutional rights are considered state actors for purposes of liability under 42 U.S.C. § 1983. See:

- *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law.");

- *Tower v. Glover*, 467 U.S. 914 (1984) (state-appointed defense counsel may be liable under § 1983 for conspiring with state officials);

- *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) (collaboration between private actors and police to deny civil rights renders the private party liable under § 1983).

311. Sharp's coordinated suppression of exculpatory evidence, refusal to provide material sent to the GAL, misrepresentation of facts to the court, and orchestration of punitive conditions—without evidentiary basis or legal authority—constitute overt acts in furtherance of a civil conspiracy. Each act was designed to cause actual injury, and collectively, they deprived Plaintiff of her liberty, property, dignity, and parental rights.

312. Accordingly, Sharp's actions are actionable under:

- Count I (Civil Rights, § 1983);

- Count II (Conspiracy);

- Count III (Due Process);

- Count IV (Retaliation);

- Count VI (Emotional Distress);

- Count VII (Abuse of Process);

- And potentially Count IX (Fraud Upon the Court).

313. Courts have consistently held that attorneys may be held personally liable under 42 U.S.C. § 1983 and § 1985(3) when they act not as independent advocates, but as co-conspirators with state actors in schemes to deprive individuals of their constitutional rights. The doctrine of "color of law" extends beyond formal government agents and encompasses private individuals who willfully participate in joint actions with public officials to cause unconstitutional harm.

314. The U.S. Supreme Court's decision in *Dennis v. Sparks*, 449 U.S. 24 (1980), is

foundational. In *Dennis*, the Court held that private parties who conspire with a judge to deprive another of rights are not immune from liability merely because they are not themselves public officials. The Court stated unequivocally: "Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983."

315. This principle has been repeatedly upheld in cases involving lawyers who step outside their role as neutral advocates and instead collude with police officers, social workers, or judges to advance a retaliatory, coercive, or discriminatory agenda.

316. Other key authorities reinforcing this position include:

- Tower v. Glover, 467 U.S. 914 (1984) – confirming that public defenders and private attorneys may be liable under § 1983 if they conspire with state actors to violate civil rights.

- Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) – affirming that a private party's "willful participation in joint activity" with state actors is sufficient to trigger liability.

- Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) – holding that joint participation in unconstitutional acts, even by private actors, constitutes action under color of law.

317. In the instant case, David Sharp's collaboration with Judge Sandman, law enforcement officers, and DCF officials—all of whom are unquestionably state actors—demonstrates a level of coordination and shared intent that satisfies both the state action requirement of § 1983 and the conspiracy standard under § 1985(3).

318. Specifically, Sharp's acts—such as:

- Suppressing exculpatory evidence;

- Depriving Plaintiff of procedural rights;

- Imposing medically baseless testing regimens;

- Withholding materials from the Guardian ad Litem;

- Repeatedly misrepresenting facts to the court to inflame bias;

—are not protected litigation conduct, but actionable under civil rights statutes when

performed as part of a multi-agency scheme to punish and destabilize Plaintiff for asserting

her rights.

319. Further, § 1985(3) provides an additional cause of action for conspiracy to interfere with

civil rights, requiring:

1. A conspiracy;

2. Motivated by discriminatory animus or intent to retaliate against protected activity;

3. An act in furtherance of the conspiracy;

4. Resulting in deprivation of federally protected rights.

320. Sharp's deliberate coordination with public agents—especially in the custody and

housing contexts—clearly meets this threshold, particularly as the targeted acts followed

Plaintiff's attempts to report domestic abuse, seek a protective order, and retain custody of

her child.

321. Therefore, Sharp cannot shield himself behind the attorney-client relationship or

litigation privilege, as his conduct was extra-judicial, conspiratorial, and executed under

color of law. His actions expose him to full liability under:

- 42 U.S.C. § 1983 (Count I);

- 42 U.S.C. § 1985(3) (Count II);

- And complementary state law tort claims, including fraud, emotional distress, and

abuse of process.

322. The actions of Defendant David Sharp—undertaken in collaboration with state officials and for retaliatory, coercive, and financially exploitative purposes—constitute violations of multiple constitutional and statutory protections, giving rise to the following claims:

323. Count I: Violation of Civil Rights (42 U.S.C. § 1983): Sharp's participation in the deprivation of Plaintiff's fundamental rights—particularly her right to due process, familial association, and freedom from unlawful searches and state-enabled coercion—renders him liable under 42 U.S.C. § 1983.

- *Dennis v. Sparks*, 449 U.S. 24 (1980) and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) both establish that private individuals who collaborate with state actors may be held liable for civil rights violations under color of law.

- Sharp's repeated misrepresentations in court, suppression of evidence, and interference with court-ordered proceedings directly violated Plaintiff's Fourteenth Amendment rights and her right to access the courts under *Christopher v. Harbury*, 536 U.S. 403 (2002).

324. Count II: Civil Conspiracy (42 U.S.C. § 1985(3)): Sharp conspired with Judge Sandman, law enforcement officers, and DCF agents to target Plaintiff for legal and reputational destruction, based on retaliatory animus arising from her protected conduct (e.g., seeking a protective order, reporting abuse, litigating custody).

- Under *Griffin v. Breckenridge*, 403 U.S. 88 (1971), and *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), a § 1985(3) claim may be maintained when two or more persons conspire to deprive another of equal protection or equal privileges under the law.

105

- Sharp's role in coordinating procedural traps, denying evidence access, and orchestrating judicial manipulation demonstrates clear agreement and overt acts in furtherance of such a conspiracy.

325. Count III: Violation of Due Process (Fourteenth Amendment): Plaintiff was denied notice, a meaningful opportunity to be heard, and access to critical evidence. Sharp's refusal to produce materials shared with the GAL, his orchestration of late-day filings, and his manipulation of court-imposed drug testing standards violated both procedural and substantive due process under the Fourteenth Amendment.

- *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires fair process before deprivation of liberty interests, which includes parental rights and reputational standing.

- *Goldberg v. Kelly*, 397 U.S. 254 (1970) affirms that the right to be heard must be meaningful and timely—violated when opposing counsel intentionally sabotages procedural fairness.

311. Count IV: Retaliation for Protected Conduct: Sharp's conduct was in retaliation for Plaintiff's First Amendment-protected activities, including petitioning for a protective order, filing grievances, and asserting custodial rights.

- *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977) provides that adverse government actions taken in response to protected expression violate constitutional rights.

- Sharp's inflammatory accusations, fraudulent filings, and obstruction of exculpatory evidence were done not in defense, but in punishment for Plaintiff's protected efforts to seek legal and personal safety.

312. Count VI: Intentional Infliction of Emotional Distress: By knowingly making false accusations of alcoholism, manipulating court procedures to prolong trauma, denying access to exculpatory materials, and colluding to damage Plaintiff's health and reputation, Sharp's conduct was extreme and outrageous.

- Massachusetts recognizes IIED where a defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," *Agis v. Howard Johnson Co.*, 371 Mass. 140 (1976).

- Sharp's statements about "flushing," his hallway confrontations, and malicious labeling of Plaintiff as an addict—after clear evidence to the contrary—were deliberate attempts to cause harm, meeting this standard.

313. Count VII: Abuse of Process: Sharp used the judicial system not to adjudicate genuine legal disputes, but to harass, retaliate, and impoverish Plaintiff through procedural manipulation and strategic obstruction. Abuse of process arises when "legal process, whether criminal or civil, is used against another primarily to accomplish a purpose for which it is not designed." Jones v. Brockton Pub. Mkts., Inc., 369 Mass. 387 (1975) Examples include: filing emergency motions to ambush Plaintiff, hiding communications with the GAL, demanding unfounded testing after 7 months of clean results, and pursuing seizure of Plaintiff's home sale proceeds.

314. In or around March of 2025, Defendant Attorney David Sharp unlawfully colluded with the closing attorney overseeing the Plaintiff's real estate transaction to deliberately conceal material terms in the final escrow and settlement documents. Specifically, Sharp aided in the inclusion and concealment of a clause that deviated from the parties' explicit equal

investment of a 50/50 disbursement of net sale proceeds. Plaintiff was not made aware of this clause prior to closing, nor did she consent to the deviation in disbursement allocation.

315.    This concealed provision facilitated the unauthorized withholding and redirection of Plaintiff's share of escrowed funds, constituting a breach of fiduciary duty by both attorneys involved. The scheme violated basic contractual fairness and the implied covenant of good faith and fair dealing, rendering the altered settlement terms voidable for fraud in the inducement. Sharp's conduct further constitutes tortious interference with contractual and property rights, and reflects a broader pattern of abuse of process and collusion with other defendants to deprive Plaintiff of financial assets and control over her property.

316.    Sharp's actions formed part of a continuous and coordinated civil conspiracy among defendants—including but not limited to Plaintiff's abuser—to isolate the Plaintiff from her financial autonomy, strip her of equity in jointly owned property, and weaponize legal instruments to impose financial duress. These acts occurred under color of state authority and in violation of Plaintiff's due process and equal protection rights under the Fourteenth Amendment and Article I of the Massachusetts Declaration of Rights.

317.    Plaintiff was told, under extreme duress, that if she did not immediately sign the escrow and settlement agreement, the pending real estate sale would collapse and she would face imminent legal action from the prospective buyers for breach of contract. This representation—delivered in the presence of and at the direction of Defendant Attorney David Sharp—was made with full knowledge of Plaintiff's documented cognitive disability, history of trauma, and impaired legal capacity under stress. Defendant Sharp and the closing attorney exploited Plaintiff's vulnerable state to manufacture a false sense of urgency and fear, thereby coercing her into signing a materially altered agreement without independent

108

counsel or meaningful opportunity to review its terms.

318. This constituted a textbook example of economic and psychological duress under Massachusetts law. The threat of financial ruin and litigation, presented as an imminent consequence of noncompliance, vitiated Plaintiff's consent and rendered the execution of the agreement involuntary and legally voidable. Moreover, Defendant Sharp's active role in this coercive tactic—despite his fiduciary duties as an officer of the court—amounted to a knowing abuse of power, trust, and professional responsibility. His actions not only breached ethical and legal standards but formed part of a larger conspiracy to deprive Plaintiff of her rightful property interests and undermine her financial autonomy through unlawful means

319. Such conduct violates core principles of contract law (e.g., Cabot Corp. v. AVX Corp., 448 Mass. 629, 637–38 (2007), requiring knowing and voluntary assent), fiduciary obligations (e.g., Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998)), and constitutes actionable fraud, undue influence, and constructive duress. Plaintiff's signature was not the product of free will, but of intentional manipulation and coercion orchestrated by Defendant Sharp for unlawful advantage.

320. As a direct and foreseeable consequence of Attorney David Sharp's misconduct, Plaintiff sustained severe and compounding financial harm. By facilitating the unlawful diversion and withholding of Plaintiff's lawfully entitled share of real estate sale proceeds, Sharp undermined Plaintiff's financial stability at a critical juncture. These funds were not only essential for her ability to retain counsel and engage in meaningful litigation, but also necessary for her to provide for her minor child, secure stable housing, and meet basic subsistence needs.

321. Sharp's actions created an immediate and destabilizing shortfall in Plaintiff's resources,

leading to cascading harms: she was rendered unable to pay for adequate legal representation, forced to navigate a hostile judicial environment pro se, and ultimately driven into homelessness while caring for a special-needs service animal. Plaintiff endured repeated exposure to unsafe living conditions, extreme weather, and physical vulnerability, all of which compounded the emotional trauma already inflicted by the other Defendants.

322.    This economic sabotage—executed by an officer of the court with knowledge of Plaintiff's disabilities and financial fragility—constituted not only civil conspiracy and tortious interference with economic expectancy, but a targeted and unconstitutional deprivation of liberty and property under color of law. These harms are compensable under both 42 U.S.C. §§ 1983 and 1985, and constitute aggravated forms of intentional infliction of emotional distress, financial coercion, and abuse of process under Massachusetts common law (Agis v. Howard Johnson Co., 371 Mass. 140, 144 (1976); Simon v. Solomon, 385 Mass. 91, 102–03 (1982)).

323.    Attorney David Sharp's outright refusal to participate in good-faith mediation or any reasonable resolution regarding the disputed escrow proceeds—despite Plaintiff's repeated written requests and clear legal entitlement to her share—demonstrates not only a breach of professional ethics, but a calculated act of retaliation and obstruction. Plaintiff provided documentation establishing her right to a 50% disbursement under the original agreement. Nonetheless, Sharp disregarded her attempts to resolve the matter informally or through alternative dispute resolution mechanisms, in defiance of prevailing legal norms favoring early settlement and mitigation of harm.

324.    Sharp's stonewalling had no legal justification and served only to prolong Plaintiff's financial hardship, increase litigation burdens, and exert coercive pressure on Plaintiff to

110

abandon her claims. This behavior violates the duty of candor and cooperation imposed on attorneys under the Massachusetts Rules of Professional Conduct (see Mass. R. Prof. C. 3.4 and 4.1), and constitutes bad faith conduct actionable under the doctrines of abuse of process and tortious interference.

325. Sharp's obstruction further evidences a retaliatory animus aimed at punishing Plaintiff for asserting her legal rights—particularly in light of her pro se status and disability. His conduct obstructed access to relief, escalated her damages, and compounded the existing conspiracy among defendants to isolate and financially destabilize her. This refusal to mediate in good faith, especially where alternative dispute resolution was both feasible and statutorily encouraged (e.g., M.G.L. c. 231, § 6H), underscores Sharp's intent to weaponize procedural intransigence as a tool of continued coercion.

326. Attorney David Sharp's conduct was knowingly calculated to exploit Plaintiff's cognitive disability—specifically, a documented traumatic brain injury that substantially limits her executive functioning and ability to process complex legal and financial information under stress. At all relevant times, Sharp was aware of Plaintiff's disability and its impact on her comprehension and decision-making capacity. Rather than taking steps to ensure Plaintiff's meaningful participation in the real estate transaction or to safeguard her rights, Sharp actively leveraged her impairment to secure an unconscionable financial outcome.

327. This conduct violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, which prohibits discrimination against qualified individuals with disabilities in the provision of public services, including access to judicial and quasi-judicial proceedings, and extends to instrumentalities of the state and officers of the court. By denying Plaintiff effective communication, meaningful access to critical settlement information, and refusing

to provide or even acknowledge the need for reasonable accommodations during the transaction and post-closing dispute, Sharp unlawfully deprived her of equal participation in a matter involving fundamental property rights.

328.    Further, Sharp's actions constituted discriminatory animus under the ADA, and were effectuated in a manner that not only exploited but weaponized Plaintiff's disability to manipulate a financial transaction. His refusal to ensure capacity-based safeguards, coupled with coercive pressure and concealment of material terms, deprived Plaintiff of informed consent and equitable treatment. Such conduct also gives rise to liability under 42 U.S.C. § 1983 for the deprivation of federal rights under color of state law, where the acts occurred within the scope of a broader judicial and fiduciary process.

329.    By manipulating Plaintiff's disability in a legal and financial context, Sharp violated not only statutory protections under federal law, but also basic duties of care and loyalty arising under Massachusetts common law. His actions fall squarely within the scope of intentional infliction of emotional distress (Simon v. Solomon, 385 Mass. 91 (1982)), and constitute a form of disability-based exploitation that demands judicial sanction and compensatory redress.

330.    Attorney David Sharp's conduct—executed under color of legal authority and in coordinated alignment with both private parties and state actors—constitutes a civil conspiracy in violation of 42 U.S.C. § 1985(3). Through his deliberate participation in a pattern of discriminatory, coercive, and deceptive practices, Sharp conspired to deprive Plaintiff of her constitutional rights to due process and equal protection of the laws, in violation of the Fourteenth Amendment and Article I of the Massachusetts Declaration of Rights.

331.    Specifically, Sharp's involvement in the fraudulent alteration of the escrow disbursement, his exploitation of Plaintiff's disability, and his refusal to mediate or rectify the financial harm he orchestrated were not isolated acts, but integral components of a broader scheme involving state officials, judicial officers, and opposing counsel. This coordinated effort was designed to isolate Plaintiff financially, strip her of parental and property rights, and obstruct her access to legal recourse.

332.    Such acts fall squarely within the scope of 42 U.S.C. § 1983, which provides a cause of action against persons who, under color of state law, deprive individuals of federally protected rights. Sharp's abuse of his role as an attorney in court-supervised transactions and proceedings qualifies as action under color of state law for § 1983 purposes, particularly where he acted in concert with government agents and officers who enabled, enforced, or ratified his conduct.

333.    Additionally, Sharp's conduct violated the Massachusetts Civil Rights Act (MCRA), M.G.L. c. 12, §§ 11H and 11I, which prohibits threats, intimidation, or coercion used to interfere with the exercise or enjoyment of constitutional or statutory rights. By using threats of litigation, false urgency, and Plaintiff's cognitive vulnerability as leverage to force her consent to an illegal deprivation of funds, Sharp engaged in coercion within the meaning of the MCRA (Bally v. Northeastern Univ., 403 Mass. 713, 718–19 (1989)). His actions were not only retaliatory, but intended to suppress Plaintiff's ability to assert her rights, obtain fair judicial process, and protect her economic and familial integrity.

334.    The conspiracy alleged herein does not rest on abstract allegations of misconduct, but on concrete acts of coordination, deception, and unlawful pressure—all in furtherance of a shared objective to marginalize, discredit, and economically destabilize Plaintiff through

113

abuse of both private and public mechanisms of power.

335.    COUNT XI: Financial Coercion, Escrow Theft, and Violation of the Americans with Disabilities Act

a. Plaintiff restates and realleges all preceding paragraphs as if fully set forth herein.

b. Defendant Attorney David Sharp, acting under color of legal authority and in coordinated conspiracy with private parties and public officials, intentionally coerced Plaintiff into signing a legal agreement during a real estate transaction containing undisclosed and materially deceptive terms. This coercion was achieved through the use of false legal threats, misrepresentations regarding the consequences of non-signature, and strategic exploitation of Plaintiff's known cognitive disability, specifically a traumatic brain injury that substantially impairs executive functioning, memory, and comprehension of complex documents under duress.

c. Defendant Sharp acted with deliberate indifference to Plaintiff's federally protected rights and utilized his authority to effectuate the illegal redirection, concealment, and theft of Plaintiff's rightful share of escrowed proceeds from a real estate transaction. Plaintiff was fraudulently induced to consent to terms under threat that the sale would fail and she would be sued by the buyers if she did not sign immediately—despite the existence of a prior 50/50 agreement regarding disbursement.

d. Defendant's actions constitute:

- A deprivation of property and due process rights under 42 U.S.C. § 1983, where Plaintiff was denied meaningful notice, a fair hearing, and the right to equitable treatment in the disposition of her property interests;

- A conspiracy to deny equal protection and due process in violation of 42 U.S.C. §

114

1985(3), carried out through coordination with other defendants to target Plaintiff's disability, suppress her access to legal redress, and interfere with her economic autonomy;

- A violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), where Plaintiff was denied effective communication, reasonable accommodations, and equal access to legal and financial proceedings involving her property, solely on the basis of her disability;

- And a violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I, by means of intimidation, coercion, and threats that interfered with Plaintiff's exercise of her legal and constitutional rights, including the right to contract, the right to equal protection, and the right to access judicial processes without discrimination.5. As a direct and proximate result of Defendant Sharp's unlawful conduct, Plaintiff suffered: The wrongful deprivation and loss of real estate sale proceeds; Forced homelessness and inability to secure stable housing for herself and her minor child;  Loss of access to legal representation due to economic sabotage; Aggravation of disability-related symptoms including anxiety, cognitive disorientation, and PTSD; And severe emotional distress, all of which are actionable under the aforementioned statutes and common law tort principles.

## CLOSING STATEMENT

Plaintiff, Maria-Elena Mariel Olcoz, brings this civil rights action to seek redress for a sweeping and orchestrated campaign of constitutional violations executed by state actors and private parties under color of law. The conduct at issue includes conspiracy to deprive Plaintiff of her

child, obstruction of ADA accommodations, suppression of evidence, judicial discrimination, retaliatory agency filings, and economic abuse—all without legal justification or meaningful oversight. For nearly two years, Defendants—including judges, attorneys, DCF personnel, and private individuals—acted in concert to destroy Plaintiff's stability, her health, and most importantly, her relationship with her child. These actions were not judicial in nature, nor protected by immunity; they were administrative, retaliatory, and unconstitutional. Defendants repeatedly weaponized public systems against Plaintiff in clear violation of the First, Fourth, and Fourteenth Amendments, the Americans with Disabilities Act, and established principles of due process. The Plaintiff's separation from her child constitutes an egregious deprivation of liberty. As recognized by the U.S. Supreme Court and federal appellate courts, the value of a parent's time with their child is profound, with courts affirming valuations as high as $600 per hour for wrongful separation (see Thomas v. Texas Dept. of Family & Protective Servs., 2021 WL 4810273; Kerman v. City of New York, 374 F.3d 93 (2d Cir. 2004)). Over a span of two years (approximately 17,000 hours), Plaintiff's resulting loss totals over $10 million in quantifiable parenting time alone—without factoring in the additional harm caused by property loss, business destruction, and emotional distress. Further, this case exposes a dangerous and systemic pattern of abuse requiring urgent judicial scrutiny. It presents an opportunity to establish case law that clarifies the limits of state discretion, reinforces ADA protections in family law contexts, and penalizes the use of court and agency systems as tools of coercion and retaliation. The gravity of these harms demands not just compensation, but systemic correction.

## DAMAGES SOUGHT:

Plaintiff seeks Thirty Five Million & Two Hundred and Fifty Thousand Dollars ($35,250,000.00) in compensatory and punitive damages, proportionately allocated based on the

116

degree of culpability, prolonged nature of misconduct, and causal contribution to Plaintiff's harms:

- Judge Kathleen Sandman – $10,000,000 for retaliation, denial of due process, unlawful judicial orders, child endangerment, physical abuse, and misuse of court authority.

- Attorney David Sharp – $9,250,000 for conspiracy, defamation, intentional infliction of emotional distress, evidence tampering, obstruction of justice, coercion, retaliation, unjust enrichment, and judicial manipulation.

- Officer Tim Budrewicz – $3,000,000 for failure to protect, abuse of authority, unlawful guidance to abuser, and conspiratorial misconduct.

- Officer Greg Bardwell – $3,000,000 for participation in the same unlawful actions and prolonged indifference, in tandem with Budrewicz.

- Brenda Liimatenan – $2,000,000 for unlawful search, failure to follow protocol, failure to protect a child from abuse, and retaliatory case opening.

- Allyn Stacy – $4,000,000 for fabrication of evidence, collusion, suppression, child endangerment, coercive control, coercion, and manipulation of records including perjury.

- Rhonda Wornham – $4,000,000 for retaliatory testimony, abuse of position, child endangerment, fraud upon the court, and enabling further state harm.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

A. Declaratory Judgment that Defendants violated Plaintiff's constitutional rights under the First,

117

Fourth, and Fourteenth Amendments; Title II of the Americans with Disabilities Act; and other relevant provisions of federal law;

B. Injunctive Relief enjoining Defendants, their successors, agents, or affiliates from continuing any form of retaliation, denial of accommodations, or custodial interference;

C. Compensatory Damages

Plaintiff seeks compensatory damages in the amount of at least $35,250,000, reflecting:

- Lost parenting time (valued at $600/hour × ~17,000 hours), consistent with federal precedent;

- Loss of business, wages, career trajectory, and property, resulting in significant economic harm;

- Future wage loss, costs of restarting professional standing, and loss of political opportunity;

- Lifelong medical care, including psychological therapy, dental reconstruction, neurological imaging, and surgery;

- Time spent preparing and litigating this case ($500/hour × 4,160 hours) due to being forced to proceed pro se;

- Fees and out-of-pocket expenses for legal, expert, visitation supervision, transportation, and vehicle degradation;

- Financial penalties and credit destruction, including interest, late fees, and involuntary public assistance reliance;

- Funds owed to third parties who supported Plaintiff during forced homelessness and unlawful deprivation of income;

118

- Educational and rehabilitation fund for the minor child, replacing assets destroyed by Defendants' actions.

D. Punitive Damages against all individual Defendants whose conduct was willful, malicious, or in reckless disregard of Plaintiff's constitutional and statutory rights;

E. Structural Relief requiring:

- Judicial review and potential bench removal of judge involved;
- Massachusetts Board of Bar Overseers review and disbarment proceedings for attorney misconduct;
- Immediate termination and federal investigation of involved DCF workers;
- Mandatory training for judges, police, DCF, and attorneys in constitutional, ADA, and domestic violence rights;
- A Massachusetts-wide education initiative on domestic violence and coercive control for all high schools and families;

F. Institutional Reform Funding requiring a $5 million donation to Plaintiff's domestic violence organization providing counsel, experts, therapy, and homelessness prevention for survivors;

G. Attorneys' Fees and Costs under 42 U.S.C. § 1988 (if counsel is retained);

H. Any further relief the Court deems just, proper, and necessary to effectuate systemic accountability and Plaintiff's full restoration.

12/19/2025

Respectfully submitted,

MARIA-ELENA MARIEL OLCOZ

21 Park Street #10, Adams, MA 01220

Phone: (305) 766-3690

Email: marielolcoz@yahoo.com

Pro Se Plaintiff